## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 34970-2008

| | | |
|---|---|---|
| LESLIE WEINSTEIN and LINDA WEINSTEIN, husband and wife, individually and as guardians ad litem for SARAH WEINSTEIN, | ) ) ) ) | Boise, January 2010 Term |
| | ) | 2010 Opinion No. 61 |
| Plaintiffs-Respondents-Cross Appellants, | ) ) | Filed: June 1, 2010 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, PRUDENTIAL GENERAL INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, and LM PROPERTY AND CASUALTY INSURANCE, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellants-Cross Respondents. | ) ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Darla S. Williamson, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>vacated in part</u>.

Anderson, Julian & Hull LLP, Boise, for appellants. Robert A. Anderson argued.

Risch Pisca, PLLC, and Goss Gustavel Goss, PLLC, Boise, for respondents. John Insinger argued.

---

EISMANN, Chief Justice.

This is an appeal from a judgment for compensatory damages for breach of an insurance contract, from an award of punitive damages for insurance bad faith, and from the award of attorney fees. The district court ordered a new trial on punitive damages unless the plaintiffs accepted a remittitur, and they cross appeal from that order. We affirm the judgment for compensatory damages, we vacate the award of attorney fees, we deny the cross appeal, we

affirm the amount of punitive damages determined by the district court to be consistent with due process, and we vacate the plaintiffs' option to request a new trial on punitive damages.

## I. FACTS AND PROCEDURAL HISTORY

On September 30, 2002, an uninsured, sixteen-year-old driver with a suspended license pulled out of a private driveway onto a public street and negligently failed to yield to a pickup, striking it and causing it to collide with an automobile in which Sarah Weinstein was a passenger. The automobile was owned by Sarah's parents, Leslie and Linda Weinstein ("the Weinsteins"), and was being operated by Mrs. Weinstein. Both Sarah and Mrs. Weinstein were injured in the collision. They were taken by ambulance to a hospital, but were released that day.

At the time of the accident, they were insured under a policy of automobile insurance issued by Prudential Property and Casualty Insurance Company, which was later purchased by Liberty Mutual Insurance Company on November 1, 2003. In this lawsuit, the parties have treated the insurance companies as if they were one company, and so we will refer to them as one company called "Liberty Mutual." The insurance policy provided $5,000 in medical ("MedPay") coverage per person and $250,000 in uninsured motorist ("UM") coverage per person for bodily injury.

The Weinsteins promptly notified Liberty Mutual of the accident, and the following day it determined that the accident had been caused by an uninsured driver. It also sent "Parent of Sarah Weinstein" a letter stating that the MedPay provision required that any medical bills first be submitted to the Weinsteins' health insurance carrier and that it would only pay for any uncovered or disallowed items, assuming they were reasonable and necessary expenses.

Liberty Mutual assigned a UM adjuster to be in contact with the Weinsteins. On November 11, 2002, the adjuster sent the Weinsteins a letter asking for copies of all of their medical bills and for them to sign and return a form authorizing Liberty Mutual to obtain medical records from Sarah's treatment providers. Mrs. Weinstein signed the medical release on December 5, 2002, and sent it to the adjuster along with a list of medical providers. At the adjuster's request, Mrs. Weinstein later provided two other medical authorizations, the last so the adjuster could obtain records from the MedPay unit. Liberty Mutual did not use any of the medical authorizations or attempt to obtain any medical records from any providers. Some of the medical bills and records submitted by the Weinsteins were received by the UM adjuster, who

sent them to the MedPay unit.  The UM adjuster later attempted unsuccessfully several times to have the MedPay unit send her the MedPay file.

On January 2, 2003, Mrs. Weinstein told the adjuster that the Weinsteins were receiving threatening telephone calls concerning unpaid medical bills and that she and Sarah were still receiving treatment.  Liberty Mutual responded on February 12, 2003, by sending the Weinsteins a letter stating that if it did not receive any new medical bills within thirty days it would close the MedPay file.  Twelve days later it closed the file because the Weinsteins had not yet responded to the letter.

Sarah had injured her left hip in the accident and had been receiving physical therapy.  In February 2003, her therapist released her to resume physical activities as tolerated.  When she resumed training for and playing soccer, her favorite sport, her hip pain returned.  She was only able to play ten minutes per half, and ultimately had to quit playing entirely.  Mrs. Weinstein sought further medical treatment for her.

In April 2003, Mrs. Weinstein notified the adjuster that a magnetic resonance imaging scan indicated that Sarah may require hip surgery.  The following month, Mrs. Weinstein informed the adjuster that a second scan showed that Sarah had suffered a labial tear of her left hip and that she would need surgery.  Liberty Mutual responded by increasing its reserve for Sarah's UM claim to $25,000.  Sarah had the surgery on May 19, 2003.

Prior to April 2003, Liberty Mutual incorrectly believed that the insurance policy provided that it did not have to pay Sarah's medical expenses until the bills were first submitted to and denied or only partially paid by her health insurance carrier.  In April 2003, it realized that such provision in the policy did not apply to Sarah.  It only applied to the Weinsteins as the named insureds, not to passengers in their insured vehicles.  Liberty Mutual did not make any payments under the MedPay coverage until April 2, 2003.  Prior to that time, it had sent letters to Sarah's medical providers stating that it was "unable to make payment for these charges at this time," but if Sarah's health carrier denied payment or made only partial payment, the provider should "resubmit the bill along with the health carrier's Explanation of Benefits."

Mr. Weinstein was self-employed in a business providing services to the airline industry, and his business was struggling financially as a result of the terrorist attacks of September 11, 2001.  From May 2003 on, the Weinsteins received regular telephone calls and demand letters from medical billing departments and collection agencies regarding the overdue medical bills.

3

On one occasion as Mrs. Weinstein was leaving a doctor's office with Sarah, a staff member loudly and publicly told Mrs. Weinstein that if she did not pay her outstanding bill in full immediately, the doctor would no longer treat Sarah. Although Mrs. Weinstein notified Liberty Mutual of this incident, it did nothing. These events caused Mrs. Weinstein to feel depressed and cry, and the grief, stress, and embarrassment resulted in marital discord and family turmoil.

It was Liberty Mutual's policy to exhaust the MedPay coverage before making any payment under the UM coverage and to not make any payments under the UM coverage until the insured desired to settle the entire UM claim. Sarah's MedPay benefits of $5,000 were exhausted on September 3, 2003, when Liberty Mutual made a partial payment to the hospital for her surgery. Thereafter, Liberty Mutual sent Sarah's medical providers letters stating that her "maximum policy limits of $5,000 for medical expenses related to this accident have been paid and no further payments can be made. You may wish to contact this patient or the appropriate health insurance carrier for payment of future bills." Liberty Mutual did not include in these letters the fact that Sarah had ample UM coverage to pay the medical bills.

On September 3, 2003, Mrs. Weinstein called the adjuster and told her that collection agencies were after them, that their credit was ruined, that Liberty Mutual took a lot of time to decide to pay the bills under the MedPay coverage, and that it should pay the remaining bills under the UM coverage. The adjuster answered that Liberty Mutual would not pay under the UM coverage until the Weinsteins were ready to settle the entire claim.

The Weinsteins contacted attorney Bruce Bistline to represent them. By letter dated October 10, 2003, he informed Liberty Mutual that he was representing the Weinsteins. On October 21, 2003, Liberty Mutual increased its reserve for Sarah's UM claim to $50,000.

On October 28, 2003, Bistline sent the adjuster a letter seeking information, listing unpaid medical bills, and stating that he was not aware of any reason why the bills should not be paid from the UM coverage. The adjuster later responded that it was not Liberty Mutual's practice to do so.

On April 20, 2004, Bistline sent the adjuster a letter accompanied by a notebook containing medical bills and records. In the letter he demanded payment of $16,669.64, which represented the unpaid bills as of November 20, 2003, including interest. Liberty Mutual did not pay any of the bills, but on June 7, 2004, it did increase its reserve for Sarah's UM claim to $75,000.

4

On June 11, 2004, a new UM adjuster sent Bistline a letter stating that she was now handling Sarah's UM claim, that Liberty Mutual "will afford the policy's Uninsured Motorist coverage with limits of $250,000 per person," that it had "no legal obligation" to pay Sarah's medical expenses, and that it "will offer a $10,000 payment in advance on Ms Weinstein's future settlement" if her parents signed the enclosed form. The letter added, "We will evaluate Ms Weinstein's damages when her medical treatment is completed or when you submit a settlement demand with all the medical documentation and proofs."

The form enclosed with the letter required the Weinsteins to agree, among other things, that the payment "does not constitute an admission of any liability by the uninsured motorist . . . for any damages Sarah Weinstein has sustained in the above-described [9/30/02] accident" and that Liberty Mutual "reserves all of its rights including, but not limited to, defenses which may be applicable to this claim." Bistline responded by letter dated July 7, 2004, stating that the Weinsteins did not believe they had a duty to agree to anything in order to receive payments due under the policy and that they cannot wait any longer due to the statute of limitations. They had therefore instructed him to file a lawsuit, which he had done. He enclosed a copy of the complaint with the letter. Later, the Weinsteins' current counsel replaced Bistline. The above does not list all of the contacts between Liberty Mutual and the Weinsteins or their counsel before this lawsuit was filed.

On January 5, 2005, Liberty Mutual paid the Weinsteins the sum of $80,000. That payment was $60,000 for Sarah's injuries; $17,000 for prejudgment interest; and $3,000 for attorney fees.

This case was ultimately tried to a jury in September 2007. It returned a special verdict finding: (a) that Liberty Mutual had breached the MedPay provisions in the insurance policy but had not committed bad faith in handling the MedPay coverage; (b) that Liberty Mutual had breached the UM provisions in the insurance policy and had committed bad faith in handling the UM coverage; (c) that the Weinsteins have suffered damages totaling $210,000 as a result of Liberty Mutual's bad faith; (d) that they were entitled to punitive damages in the sum of $6,000,000; and (e) that Sarah sustained damages in the sum of $250,000 as a result of the accident.

On October 1, 2007, the court entered judgment in favor of the Weinsteins against Liberty Mutual in the sum of $6,210,000, and on October 19, 2007, it entered judgment in favor

of Sarah against Liberty Mutual in the sum of $165,000. The court later entered an amended judgment in favor of Sarah in the sum of $182,225.48 to correct certain calculations and add prejudgment interest, and in addition it also awarded her $84,150.00 in attorney fees and $2,958.15 in court costs.

Liberty Mutual filed motions for a new trial, for judgment notwithstanding the verdict, and for a remittitur. The district court denied the motions, except that it granted a new trial on punitive damages if the Weinsteins would not accept a reduction in punitive damages to $1,890,000. Liberty Mutual appealed and the Weinsteins cross-appealed.

## II. ISSUES ON APPEAL

1. Did the district court err in permitting the Weinsteins to amend their complaint to add a claim for punitive damages?

2. Did the district court err in failing to grant a mistrial or a new trial due to the Weinsteins providing annotated exhibits to the jury?

3. Did the district court err in instructing the jury?

4. Did the district court err in failing to grant Liberty Mutual's motions for a directed verdict, judgment notwithstanding the verdict, or new trial because the Weinsteins failed to prove a claim of bad faith?

5. Did the district court err in failing to grant Liberty Mutual's motions for a directed verdict, judgment notwithstanding the verdict, or new trial because the Weinsteins failed to prove or mitigate their damages?

6. Did the district court err in awarding Sarah attorney fees pursuant to Idaho Code § 41-1839?

7. Did the district court err in refusing to apply Idaho Code §§ 6-1604(1) & (3) to this action?

8. Did the district court err in failing to grant a new trial on the ground of juror misconduct?

9. Should this Court vacate the award of punitive damages on the ground that the Weinsteins failed to prove unconscionable conduct by clear and convincing evidence?

10. Should the award of punitive damages be set aside due to errors in jury instructions and in admitting evidence?

11. Did the remitted award of punitive damages in the sum of $1,890,000 violate due process?

12. Did the district court err in granting a new trial on punitive damages if the Weinsteins do not accept the sum of $1,890,000 in punitive damages?

# III. ANALYSIS

## A. Did the District Court Err in Permitting the Weinsteins to Amend Their Complaint to Add a Claim for Punitive Damages?

Liberty Mutual contends that the district court erred in permitting the Weinsteins to amend their complaint to add a claim for punitive damages. Liberty Mutual's argument, however, addresses two separate amendments of the complaint.

First, Liberty Mutual asserts, "The court abused its discretion in allowing Plaintiffs to amend their Complaint to cure certain defects in their pleadings (i.e., limiting their cause of action to events after September 3, 2003) during the summary judgment hearing, and after the deadline set by the court for amended pleadings." This rather cursory argument apparently refers to the district court permitting the Weinsteins to file a third amended complaint.

During argument on Liberty Mutual's motion for summary judgment on April 25, 2007, an issue arose as to whether the second amended complaint alleged a bad faith claim with respect to the MedPay coverage. Weinstein's counsel then orally moved to file a third amended complaint to eliminate any issue in that regard. During the hearing on that motion on May 2, 2007, Liberty Mutual objected that the motion was untimely and that Liberty Mutual would be prejudiced by the amendment. The district court found that the motion was made six or seven days after the deadline for filing motions, that Liberty Mutual had not shown any prejudice, and that there was adequate time to conduct any additional discovery that may be needed if the amendment was granted. The trial was scheduled to begin in mid-September. It also found that there was good cause for permitting the amendment because Liberty Mutual had been aware since at least December 2006 that MedPay was an issue and because the court had indicated during a hearing in December 2006 that the allegations in the second amended complaint were sufficient to raise the issue of Liberty Mutual's handling of the MedPay coverage.

Rule 16(b)(7) of the Idaho Rules of Civil Procedure states that a scheduling order may be modified for good cause. In addition, alleged errors not affecting substantial rights will be disregarded. *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 426, 95 P.3d 34, 44 (2004). Liberty Mutual has failed to show either that the district court abused its discretion in considering the late-filed motion or that it was prejudiced by the granting of the motion.

Second, on May 2, 2007, the district court also heard the Weinsteins' motion to amend their complaint to add a claim for punitive damages. The court granted that motion, and the Weinsteins filed their fourth amended complaint adding that claim on the same date. Liberty Mutual contends, "Allowing Plaintiffs to argue for punitive damages at trial changed the character of the trial and prejudiced Defendants as a result." In this cursory allegation, Liberty Mutual does not attempt to explain how the character of the trial was changed or how it was allegedly prejudiced.

Idaho Code § 6-1604(2) provides, "The court shall allow the motion to amend the pleadings [to add a claim for punitive damages] if, after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." A trial court's ruling on a motion to amend a complaint to add a claim for punitive damages is reviewed for an abuse of discretion. *Todd v. Sullivan Constr. LLC*, 146 Idaho 118, 121, 191 P.3d 196, 199 (2008). Liberty Mutual's unsupported statement that it was prejudiced by the amendment is insufficient to show an abuse of discretion.

**B. Did the District Court Err in Failing to Grant a Mistrial or a New Trial Due to the Weinsteins Providing Annotated Exhibits to the Jury?**

During the second day of trial on September 18, 2007, Weinsteins' counsel asked if he could distribute to the jurors copies of a white binder containing exhibits that had been admitted. The district court asked Liberty Mutual's attorney if he had any objection, and he stated that he did not. Three days later, after the jury was excused for lunch, Liberty Mutual's counsel addressed the court stating that he had seen one of the jurors reviewing the exhibit list in his white binder and had noticed that the list had annotations on it. Counsel recited an example of the annotations as follows: "Exhibit 63, Linda [Weinstein] mailed medical authorization form to Kempczenski [UM adjuster] to print. Kempczenski never used it. 9/2/03 UM adjuster log, first entry since 5/12/03." Counsel then moved for a mistrial.

Weinsteins' counsel responded that there was nothing on the exhibit list that was not in the record; that when asking to distribute the binders to the jury he had stated that the binders included the chronology and exhibit list that had been provided to the court; and that Liberty Mutual's counsel had not objected. He suggested that they just collect the notebooks from the

jurors, instruct them to disregard anything in them, and then address the issue at a later time. Liberty Mutual's counsel responded that he was sticking with his motion. The court stated that before ruling on the motion it wanted to listen to the tape recording of what occurred when the Weinsteins' counsel asked to distribute the binders to the jurors. Liberty Mutual's counsel suggested that they complete the day of testimony and address the issue the following Monday, and the court agreed.

After the jurors returned from lunch, the district court had the bailiff collect the notebooks from the jurors. The court then instructed the jury as follows, "Ladies and gentlemen, in the event that you had read any of the narrative statements on that chronology and exhibit list, you are instructed at this time to disregard any of those statements that you read."

On the following Monday, the district court took up the motion for a mistrial. The court recited what had occurred as follows:

> THE COURT: I went back and listened to the recording and Mr. Risch had asked that the plaintiffs' exhibit be published and be presented to the jury. There was no objection to that.
>
> And then, right after that, you had asked for a sidebar, and then right after that, Mr. Risch indicated that he was also providing them a copy of the chronology and exhibit list, and there was no response in regards to that.
>
> So I think probably, Mr. Anderson, you were distracted because you had asked for a sidebar. I think that's probably why you didn't say anything, but he did put that on the record that he was providing that document to them.
>
> I have looked at these, all of the chronology and exhibit list. We've gotten all of these from the jury, and I couldn't find any of them that had been marked on or highlighted. I had instructed the jury to disregard them.
>
> MR. ANDERSON: For the record, I saw the juror in front highlighting his copy.
>
> THE COURT: Well, and he's the juror that we're going to excuse also.[1]

The court then denied the motion for a mistrial for the following reasons: (1) it had instructed the jury to disregard the chronology and exhibit list; (2) the binders were retrieved from the jurors and it did not appear that any other juror had written or highlighted anything in the binders; (3) the juror who had highlighted in his binder was going to be excused anyway and what he had highlighted coincided with the evidence; and (4) Liberty Mutual's attorney had not objected to distributing to the jury the binders with the chronology and exhibit list.

Liberty Mutual moved for a new trial alleging, as one of the grounds, that distributing the notebooks to the jurors with the annotated exhibit list constituted an irregularity in the proceedings that deprived it of a fair trial. The district court refused to grant a new trial on the same grounds that it had denied the motion for a mistrial.

"[A] motion for mistrial is directed to the trial court's judicial discretion, and the trial court's ruling will not be disturbed unless there be shown such an abuse of discretion that defendant's rights are prejudiced." *Barry v. Arrow Transp. Co.*, 83 Idaho 41, 46-47, 358 P.2d 1041, 1045 (1960) (citations omitted). Liberty Mutual recites that the district court abused its discretion in denying the motion for mistrial, but it presents no argument to support that recital. During oral argument, counsel for Liberty Mutual was asked, "Was there anything ever in those notations that was not proven by the plaintiff?," and he responded, "Most likely not." Liberty Mutual has not shown that its substantial rights were affected by the distribution of the annotated exhibit list to the jurors or that the district court abused its discretion in denying the motion for a mistrial or for a new trial.

## C. Did the District Court Err in Instructing the Jury?

**1. Failing to give Liberty Mutual's requested instruction defining severe emotional distress.** The district court instructed the jury regarding the elements that must be proved in order for the Weinsteins to recover damages for emotional distress. The instruction was a verbatim statement of the elements that this Court listed in *Evans v. Twin Falls County*, 118 Idaho 210, 220, 796 P.2d 87, 97 (1990). Liberty Mutual requested as its supplemental jury instruction No. 9 an additional instruction stating, "A defendant is liable for emotional distress only where the distress inflicted is so severe that no reasonable person could be expected to endure it."

The proposed jury instruction comes from comment j to Section 46 of the Restatement (Second) of Torts (1965), which this Court quoted in *Evans v. Twin Falls County*, 118 Idaho 210, 220, 796 P.2d 87, 97 (1990). It was included in the comment in juxtaposition to the statement "Complete emotional tranquillity is seldom attainable in this world, and some degree of transient

---

[1] The juror was scheduled to be excused on Wednesday so he could attend a funeral out-of-state. The court apparently wanted to wait until Wednesday before excusing him in case something prevented another juror from serving to the completion of the trial. He was excused and did not participate in jury deliberations.

and trivial emotional distress is a part of the price of living among people" to explain that emotional distress must be severe, not simply the level of distress that people are expected to put up with in society. We have never held that the jury should be instructed regarding the text of comment j, and using Liberty Mutual's proposed instruction out of context could lead a jury to conclude that emotional distress is only severe if it leads to a psychological disorder. We have not required evidence of a psychological disorder in order to recover damages for emotional distress intentionally caused. *See Walston v. Monumental Life Ins. Co.*, 129 Idaho 211, 220, 923 P.2d 456, 465 (1996) (award of damages for intentional infliction of emotional distress upheld where insurer "impugned [insured's] character and drew him into a prolonged dispute when he was grieving the loss of his wife").

Liberty Mutual's entire argument in its opening brief regarding this alleged error is, "The court also erred by not instructing the jury as to the elements required to prove the intentional infliction of emotional distress as requested by Defendants' Supplemental Jury Instruction No. 9." It has not presented any argument as to why the trial court's instructions were not sufficient. "We will not consider assignments of error not supported by argument and authority in the opening brief." *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006).

**2. Instructing the jury on the Unfair Claim Settlement Practices Act.** The district court instructed the jury regarding the provisions of the Idaho Unfair Claim Settlement Practices Act, I.C. § 41-1329. Liberty Mutual contends that the district court erred in doing so because the instruction "improperly created a private cause of action in that the jury was essentially instructed that violation of the Act justified imposition of liability." In *White v. Unigard Mutual Insurance Co.*, 112 Idaho 94, 101, 730 P.2d 1014, 1021 (1986), we held that the Act "does not give rise to a private right of action whereby an insured can sue an insurer for statutory violations committed in connection with the settlement of the insured's claim." Accordingly, in this case the district court instructed the jury, "Violation of any of the above [provisions of the Act] does not give rise to a right to sue. The above are the standards of the insurance industry and may be considered by you only in your deliberations to determine whether there was an extreme deviation from industry standards which warrants punitive damages." The district court did not instruct the jury that the Act created a private cause of action.

Liberty Mutual also contends that the instruction "constituted an improper statement of law and/or improper comment on the evidence by the judge by instructing the jury as to a

standard of care." It was not error for the judge to instruct the jury as to the applicable law. "A trial court has the duty to properly instruct the jury on the law applicable to the case before it." *Sulik v. Central Valley Farms, Inc.*, 95 Idaho 826, 828, 521 P.2d 144, 146 (1974). In *Inland Group of Companies, Inc. v. Providence Washington Insurance Co.*, 133 Idaho 249, 258, 985 P.2d 674, 683 (1999), we held that testimony regarding the Unfair Claim Settlement Practices Act to establish insurance industry standards was admissible in an insurance bad faith case. Liberty Mutual contends that while the provisions of the Act can be presented through testimony, it is improper for the court to instruct the jury regarding the Act's provisions. It argues, "The trial court's inclusion of the Act in the jury instructions changed the Act from potential evidence of the industry standard to the law governing bad faith claims." The Act is not simply "potential evidence of the industry standard." It is a legislative enactment establishing insurance industry standards. The district court did not err in instructing the jury as to its provisions. Interestingly, Liberty Mutual's manual entitled "Uninsured and Underinsured Motorist Claims and the Process of Good Faith Claims Handling" affirms that a claim for violation of the implied covenant of good faith and fair dealing "can also be supported by demonstrating violations of unfair claims settlement practices statutes . . . even though these statutes . . . don't independently support a private cause of action against an insurance company."

**3. Failing to instruct the jury regarding corporate liability for punitive damages.** In *Griff, Inc. v. Curry Bean Co., Inc.*, 138 Idaho 315, 321, 63 P.3d 441, 447 (2003), this Court stated, "To recover punitive damages against a corporation, one must show that an officer or director participated in, or ratified, the conduct underlying the punitive damage award." Liberty Mutual submitted a proposed instruction stating, "To recover punitive damages against the Defendants, Plaintiffs must show that an officer or director of the Defendant corporations participated in, or ratified, the conduct underlying the conduct underlying [sic] the punitive damage award, if any, having at the time knowledge of all material facts." The district court refused to give the instruction on the ground that there was sufficient evidence in the record showing Liberty Mutual's corporate policies.

Although we have not addressed the issue of whether recovery of punitive damages for insurance bad faith requires evidence that an officer or director participated in, or ratified, the conduct constituting bad faith, neither party asserts that insurance corporations should be treated

12

differently from other corporations with respect to this requirement, and we agree. The district court should have instructed the jury on this issue.

An error in the jury instructions that does not affect a substantial right of a party is disregarded as harmless error. *Smith v. Mitton*, 140 Idaho 893, 901, 104 P.3d 367, 375 (2004); *Lubcke v. Boise City/Ada County Housing Auth.,* 124 Idaho 450, 459, 860 P.2d 653, 662 (1993); *Neff v. Hysen*, 72 Idaho 470, 474-75, 244 P.2d 146, 148-49 (1952). Liberty Mutual does not contend that there was any conflicting evidence on this issue. It contends that there was a lack of sufficient evidence to establish corporate liability for punitive damages.

The jury found that Liberty Mutual did not commit bad faith in handling the MedPay coverage, but it did commit bad faith in handling the UM coverage. The issue with respect to the UM coverage was whether Liberty Mutual committed the tort of bad faith by refusing to pay undisputed medical bills before settlement of the entire UM claim.

The adjuster who handled the claim in this case from its inception until June 11, 2004, had worked for the company since May 1975. She testified that the company had a standard practice for handling UM claims, that it was the company's practice not to pay undisputed medical bills from UM coverage until the entire UM claim was settled, and that to the best of her knowledge she handled this claim in the way the company wanted it handled. Her supervisor, who had worked for the company for about twenty-eight years, testified that it was the company practice not to pay undisputed medical bills under UM coverage until it settled the total UM claim, even if the insured was incurring medical bills for two or three years. A third witness had worked for the company from 1978 until September 2005 and was a UM adjuster during the time at issue in this case. She handled this claim beginning in June 2004 and testified that she had reviewed the handling of the UM claim in this case and it was handled in the way she was trained to handle claims.

Liberty Mutual contends that this testimony was not sufficient to show corporate liability for punitive damages. It apparently contends that the Weinsteins were required to present direct evidence that an officer or director approved of the corporate policy. It argues, "Plaintiffs presented no evidence showing ratification, let alone knowledge, by officers and directors of any of the Defendant corporations." It dismisses the testimony of the former employee because she was "not a corporate officer/director."

There need not be direct evidence that an officer or director participated in or ratified the wrongful conduct in order to sustain an award of punitive damages against the corporation. In *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 95 P.3d 34 (2004), this Court upheld an award of punitive damages in an action to recover damages for personal injuries caused when a store display of garden stepping stones partially collapsed and fell against the plaintiff. The defendant challenged the award of punitive damages on the ground that there was no evidence showing that an officer or director had participated in, or ratified, the conduct upon which the award was based. In affirming the award, we did not require direct evidence that an officer or director had participated in, or ratified, the improper manner of stacking the stepping stones. Rather, we stated:

> There is substantial evidence that Costco personnel are improperly trained, or not trained at all, in proper stocking techniques or in recognizing and correcting the hazards of falling merchandise. There is also substantial evidence from which to infer that this deviation was the cause of numerous accidents involving falling merchandise. The establishment of adequate employee training procedures is ultimately the responsibility of Costco's corporate management. Under the circumstances, Costco, as a corporation, was either aware or should have been aware that it lacked adequate training procedures and that this deficiency increased the likelihood that Costco customers would be injured by falling merchandise.

In this case, there was undisputed testimony from the two UM adjusters and their supervisor that it was company policy not to pay any medical expenses out of UM coverage until the entire UM claim was settled. That was sufficient to establish corporate liability for punitive damages regarding the handling of the UM coverage. Because that evidence was undisputed, it was harmless error for the district court to fail to instruct the jury regarding the requirements for holding a corporation liable for punitive damages.

**D. Did the District Court Err in Failing to Grant Liberty Mutual's Motions for a Directed Verdict, Judgment Notwithstanding the Verdict, or New Trial Because the Weinsteins Failed to Prove a Claim of Bad Faith?**

At the end of the Weinsteins' case, Liberty Mutual moved for a directed verdict on the issue of bad faith. After the trial, it moved for a judgment notwithstanding the verdict and a new

trial on the issue of bad faith. The motion for a new trial on that issue was based upon the alleged insufficiency of the evidence to justify the verdict.

"In reviewing a decision to grant or deny a motion for directed verdict or a judgment notwithstanding the verdict, this Court applies the same standard as that applied by the trial court when originally ruling on the motion." *Waterman v. Nationwide Mut. Ins. Co.*, 146 Idaho 667, 672, 201 P.3d 640, 645 (2009). "[W]e determine whether there was sufficient evidence to justify submitting the claim to the jury, viewing as true all adverse evidence and drawing every legitimate inference in favor of the party opposing the motion for a directed verdict." *Todd v. Sullivan Constr. LLC*, 146 Idaho 118, 124, 191 P.3d 196, 202 (2008). This Court "must simply determine whether there is substantial evidence to support the jury's verdict. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Howell v. Eastern Idaho R.R., Inc.*, 135 Idaho 733, 737, 24 P.3d 50, 54 (2001) (citation omitted).

A trial judge may grant a new trial on the ground that the evidence was insufficient to justify the verdict if: (a) "after making his or her own assessment of the credibility of the witnesses and weighing the evidence, the judge determines that the verdict is not in accord with the clear weight of the evidence" and (b) the judge "conclude[s] that a different result would follow a retrial." *Hudelson v. Delta Intl. Mach. Corp.*, 142 Idaho 244, 248, 127 P.3d 147, 151 (2005) (citation omitted). We review a trial court's decision under an abuse-of-discretion standard. *Id*.

In order for a first-party insured to recover on a bad faith claim, the insured must show: "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). Liberty Mutual contends that the Weinsteins did not prove any of these elements.

**Breach of contract.** The jury found that Liberty Mutual had breached both the MedPay and UM provisions of the insurance policy and that it had committed bad faith in its handling of the UM provision of the insurance contract. Although the tort of bad faith is not a breach of contract claim, to find that Liberty Mutual committed bad faith in handling the UM provision, there must also have been a duty under the contract that was breached. *Robinson v. State Farm*

15

*Mut. Auto. Ins. Co.*, 137 Idaho 173, 179, 45 P.3d 829, 835 (2002). Thus, both the breach of contract claim and the bad faith claim depend upon the provisions of the insurance policy.

With respect to the breach of contract claim, Liberty Mutual states, "Plaintiffs' breach of contract claim as to the UM coverage is based on an assertion that Idaho law requires a UM carrier to pay a UM claim on a piecemeal basis as bills trickle in from the claimant, and that Defendants failed to comply." With respect to the bad faith claim, it states, "it was and is debatable—i.e., a 'legal question of first impression'—whether Defendants had an obligation to make multiple payments as bills were submitted rather than doing a single evaluation and payment." Because both of these arguments involve the same provision of the insurance policy, we will discuss them together.

Part 4 of the policy describes UM coverage. The provision upon which Liberty Mutual relies is as follows:

> A. OUR OBLIGATIONS TO YOU (PART 4)
> Uninsured Motorists Bodily Injury Coverage
> If you have these coverages (see your Declarations), we will pay up to our Limit Of Liability for bodily injury as described in How We Will Settle A Claim when an insured or an insured's car is struck by an uninsured motor vehicle or trailer. Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle because:
> 1. THE OWNER OR OPERATOR IS NOT INSURED
> The owner or operator responsible for the accident has no liability insurance or liability bond or has coverage in an amount that is less than required by your state's financial responsibility law.

Liberty Mutual relies upon the policy language stating, "Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle." It argues, "'Payment' is singular. 'Amount' is singular. Nothing in the Policy supports multiple payments; the Policy refers to one 'payment' and one 'amount.' Thus, there was no contractual duty to make multiple, piecemeal payments before the Company can evaluate the UM claim in its entirety."

"Whether an insurance policy is ambiguous is a question of law over which this Court exercises free review. . . . When deciding whether or not a particular provision is ambiguous, we must consider the provision within the context in which it occurs in the policy." *Purdy v. Farmers Ins. Co. of Idaho*, 138 Idaho 443, 445-46, 65 P.3d 184, 186-87 (2003).

The word "payment" can mean both "the act of paying" and "an amount paid." Random House, Inc. *Dictionary.com.*, http://dictionary.reference.com/browse/payment (accessed: February 8, 2010). It is clear from the context that it has the latter meaning.

The first sentence states, "If you have [UM coverage], we will *pay up to* our Limit Of Liability for bodily injury." (Emphasis added.) This sentence states the maximum amount Liberty Mutual will pay under UM coverage. It cannot exceed the limit of liability for bodily injury as set forth in the policy. The phrase "we will pay" cannot reasonably be construed as indicating it will make only one payment. For example, the policy provision covering MedPay states, "*We will pay* . . . up to our limit of liability for medical payments coverage . . . ." (Emphasis added.) There is no contention that the phrase "We will pay" there means it will only make one payment under MedPay coverage.

The second sentence begins, "Our payment is based on the amount that an insured is legally entitled to recover for bodily injury . . . ." The word "payment" clearly refers to the phrase "we will pay" in the first sentence. Otherwise, there would be no maximum limit on the amount Liberty Mutual was obligated to pay. The second sentence provides that Liberty Mutual's "payment is based on the *amount* that an insured is legally entitled to recover." (Emphasis added.) In context, this portion of the sentence merely further defines the amount that Liberty Mutual is obligated to pay under UM coverage.

To make sense, the two sentences have to be read together. The first sets forth Liberty Mutual's maximum obligation under UM coverage, and the second sets forth how the amount of its actual obligation will be determined in particular instances. When read in context, the second sentence could not reasonably be construed as stating that there will be only one payment made under UM coverage.

There is a policy provision in the UM coverage section entitled "How We Will Settle a Claim (Part 4)." It states that the UM limit of liability on the declarations "is the maximum *we will pay* for all damages arising out of bodily injury to one person as a result of any one accident." (Emphasis added.) It does not state that how Liberty Mutual will settle a claim under the UM coverage is by making only one payment. It uses the same language ("we will pay") as in the MedPay provisions. There is no basis for holding that the phrase "we will pay" means one thing under the MedPay coverage and something else under the UM coverage.

Liberty Mutual also quotes from *Ryals v. State Farm Mutual Automobile Insurance Co.*, 134 Idaho 302, 307, 1 P.3d 803, 808 (2000), wherein we stated, when addressing a different issue, "[T]he purpose of Idaho's uninsured motorist statute which is to afford the same protection to a person injured by an uninsured motorist as would have been enjoyed had the tortfeasor carried liability insurance." Based upon that quotation, it argues that because Sarah could have obtained only a single judgment or settlement from the tortfeasor and could not have brought a new lawsuit each time a medical expense was incurred, an insurance company's responsibility to pay under UM coverage should be held to be the same.

*Ryals* does not support Liberty Mutual's argument. *Ryals* did not hold that a motorist with UM coverage who is injured by an uninsured tortfeasor should in all respects recover just as if the motorist had sued and the tortfeasor carried liability insurance. In *Ryals*, the accident occurred in New York, and under that state's no-fault law Ryals would not have been able to recover against the tortfeasor had she sued him. We did not hold that Ryals's insurance company should be treated just as if it was the tortfeasor. Rather, we held that the torfeasor, who had liability insurance, was not rendered uninsured by New York's no-fault law. We have never held that the relationship between an insurance company providing UM coverage and its insured is the same as the relationship between its insured and the uninsured tortfeasor. The Weinsteins had not entered into a contract with, and were not making premium payments to, the tortfeasor. The relationship between the insurance company and its insured does not vary depending upon whether the insured is making a claim under UM coverage or another type of coverage. "The tort of bad faith breach of insurance contract … is founded upon the unique relationship of the insurer and the insured, the adhesionary nature of the insurance contract including the potential for overreaching on the part of the insurer, and the unique, 'non-commercial' aspect of the insurance contract." *White v. Unigard Mut. Ins. Co*., 112 Idaho 94, 100, 730 P.2d 1014, 1020 (1986). Those factors apply to all types of coverage. When a claim is made under UM or underinsured motorist coverage, the insurance company can certainly raise any issues or defenses that the tortfeasor could have raised, but it cannot raise frivolous issues and defenses in bad faith even though the tortfeasor could get away with such conduct. As we stated in *Sullivan v. Allstate Insurance Co.*, 111 Idaho 304, 306, 723 P.2d 848, 850 (1986) (emphasis in original), "[W]e do not agree with those courts who hold that in *all* circumstances the relationship [between the insurance carrier and its insured making a claim under UM coverage] is adversarial

18

in nature and no obligation or liability rests upon the insurance carrier until the 'legal liability' of the uninsured motorist has been either admitted or adjudicated." The insurance company has a duty to act in good faith even when its insured makes a claim under the UM coverage of the policy. *Bantz v. Bongard*, 124 Idaho 780, 785, 864 P.2d 618, 623 n.5 (1993).

"The covenant requires the parties to perform, in good faith, the obligations contained in their agreement," *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 562, 212 P.3d 982, 9092 (2009), but "contract terms are *not* overridden by the implied covenant of good faith and fair dealing," *Bushi v. Sage Health Care, PLLC*, 146 Idaho 764, 768, 203 P.3d 694, 698 (2009) (emphasis in original). Liberty Mutual was entitled to rely upon the terms of the insurance policy, but it was not entitled to delay payments based solely upon its internal policies that were not part of the policy.

In this case Liberty Mutual almost immediately determined that the driver who caused the accident was both uninsured and solely at fault. Once it had made that determination, its analysis in deciding whether to pay particular medical bills under UM coverage would be no different from its analysis in deciding whether to pay those bills under MedPay coverage, up to the applicable coverage limits. The policy states what "[p]ersons making a claim under this policy must [do]," but it does not require them to specify the particular coverage under which they wish to be paid. It was Liberty Mutual that divided the Weinsteins' request for payment into a MedPay claim and a UM claim. Liberty Mutual decided, based upon its internal policies, that medical bills would not be paid under UM coverage until the MedPay coverage was exhausted and that once MedPay coverage was exhausted medical bills would not be paid under UM coverage until the insured's medical treatment was completed, even if that took years.

Liberty Mutual's obligation to pay under the UM coverage was based upon the terms of its contract with the Weinsteins. The fact that it was entitled to raise any issues or defenses that could have in good faith been raised by the tortfeasor does not alter the terms of the insurance policy, nor does it add provisions to the policy. Liberty Mutual has not pointed to any policy provision stating that UM benefits are only paid in one lump sum. It has also not pointed to any policy provision stating when UM benefits are to be paid. The well-established law in Idaho is, "Where no time is expressed in a contract for its performance, the law implies that it shall be performed within a reasonable time as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance." *Curzon v. Wells*

19

*Cargo, Inc.*, 86 Idaho 38, 43, 382 P.2d 906, 908 (1963). Thus, under its contract with the Weinsteins, Liberty Mutual was required to pay under the UM coverage within a reasonable time.

Liberty Mutual offered evidence that it was common practice in the insurance industry to make one payment under UM coverage which would include the entire UM claim. That common practice cannot alter or supplement the terms of the Weinsteins' insurance policy.[2] The finding that Liberty Mutual breached the terms of the policy by failing to make payments under the UM coverage within a reasonable time is supported by substantial evidence.

**Intentional and unreasonable delay in payment.** To prove the tort of insurance bad faith, an insured must prove that "the insurer intentionally and unreasonably denied or withheld payment." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). Liberty Mutual contends that any delay in this case was caused solely by the failure of Bistline, the Weinsteins' first attorney, to provide medical records in a timely manner. Liberty Mutual argued this to the jury, but it did not accept the argument undoubtedly because it is contrary to the evidence.

The coverage at issue with respect to the finding of bad faith is UM coverage. On December 5, 2002, Mrs. Weinstein sent Liberty Mutual's UM adjuster a signed medical authorization that had been provided by the adjuster and a list of medical providers. The adjuster testified that she did not use that medical authorization to gather any information because Liberty Mutual did not gather medical information regarding medical bills to be paid under UM coverage until the insured was ready to discuss settlement of the entire UM claim, and Sarah was still receiving treatment. Bistline did not notify Liberty Mutual that he was representing the Weinsteins until October 2003. On November 3, 2003, the adjuster had a conversation with Bistline, and her notes of the conversation included, "If you don't dispute liability and we don't dispute the bill, we have to pay under UM." She testified that she disagreed with him because her understanding was that "UM coverage was an evaluation and a settlement of the claim in its entirety." She also agreed that the company's duty to investigate the claim is independent of

---

[2] Liberty Mutual has not contended that the provisions in the Weinsteins' insurance policy were supplemented by a custom or usage in the insurance industry regarding how or when UM coverage is paid.

whatever the insured's attorney does. The adjuster had a list of medical providers, but did not seek to obtain medical records from any of those providers.

The UM adjuster who commenced handling this claim in June 2004 also testified, "[W]e needed records, as well as bills, to evaluate the claim. And normally we didn't request the records until the treatment was completed." The adjusters' supervisor testified that the standard practice of Liberty Mutual was to investigate to make sure there was an uninsured motorist involved and to investigate liability, and then to wait and see how the insured's treatment went. "And then as soon as the treatment was nearing an end, we would gather the information, get the records, and evaluate the claim." That is what Liberty Mutual did in this case.

On June 11, 2004, Liberty Mutual wrote Bistline a letter in which it stated, "In response to your request that we pay Ms Weinstein's medical expenses, we have been advised by our Idaho defense counsel that there is no legal obligation to do so." The letter also stated, "We will evaluate Ms Weinstein's damages when her medical treatment is completed or when you submit a settlement demand with all the medical documentation and proofs."

Liberty Mutual did not make any payments under UM coverage until after the Weinsteins filed this lawsuit. The evidence showed that the delay in making payments was due to its standard practice in handling UM coverage, not because of any neglect of Bistline in providing records. When it did pay bills under the UM coverage, the adjuster testified that she did not analyze them. She paid them because she was directed to do so by counsel. One of the bills was the unpaid balance of $1,104.19 owing to the hospital for Sarah's surgery. The other half of the bill had been paid a year earlier under MedPay coverage. Obviously, because Liberty Mutual had paid about half the hospital bill under MedPay coverage, the jury could reasonably have concluded that its year-long delay in paying the remainder of the bill under UM coverage was not based upon any lack of records.

The Liberty Mutual representative who supervises adjusters testified that he knew Liberty Mutual owed the Weinsteins under their UM coverage from the day after the accident. Liberty Mutual also knew that the accident was caused solely by the negligence of the uninsured driver. Although the first adjuster mistakenly believed that the policy required that Sarah's medical bills had to be first submitted to her health insurer before they would be paid under MedPay coverage, there was no testimony that anyone from Liberty Mutual believed that such requirement applied to the payment of medical bills under UM coverage. The first adjuster also agreed, from her

review of the file, that there was no indication that anyone employed by Liberty Mutual "ever debated one of these bills or disputed one of these bills that were submitted."

Liberty Mutual's position was that it was not required to make any payments under UM coverage until the entire UM claim was settled, even if liability and the medical bills were undisputed. It could not point to any provision in the insurance policy so providing. It admitted during oral argument that its internal company policy cannot modify the terms of the insurance policy. There was sufficient evidence that Liberty Mutual intentionally and unreasonably withheld payment.

The dissent argues, "The district court erred by permitting the jury to determine when medical payments were due on the Weinsteins' UM 'claim' . . . ." and "Because the jury was improperly instructed that the Weinsteins were entitled to multiple payments under the terms of their insurance policy, . . . Liberty Mutual was entitled to a directed verdict or a judgment notwithstanding the verdict in its favor." Liberty Mutual has not made these arguments on appeal, probably because it stipulated to a jury instruction that included the following:

> The terms of the contract are in dispute as to whether the Defendants were in compliance with the medical payments and uninsured motorist provisions of the insurance contract. You must determine what was intended by the parties as evidenced by the contract in this case. In making this determination you should consider, from the evidence, the following:
> . . . .
> 6. In insurance cases money becomes due as provided under the express terms of the insurance contract.
> 7. If an insurance policy may be given either of two reasonable meanings, one which permits recovery and one which does not, the meaning more favorable to the insured should be adopted.
> . . . .
> 9. When a contract expresses no specific time for its performance, the law implies that it is to be performed within a reasonable time, as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance.

In fact, Liberty Mutual drafted the above-quoted jury instruction. Liberty Mutual also did not object to the jury instruction informing the jury that Plaintiffs could show that Liberty Mutual breached the insurance policy as to UM coverage by proving, as one of the elements, "that payments [plural] were not timely made."

Rule 51(b) of the Idaho Rules of Civil Procedure states, "No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to

consider its verdict, stating distinctly the instruction to which that party objects and the grounds of the objection." Without addressing that Rule, or our opinions applying it such as *Saint Alphonsus Diversified Care, Inc. v. MRI Associates, LLP*, 148 Idaho 479, 481, 224 P.3d 1068, 1080 (2009); *Chapman v. Chapman*, 147 Idaho 756, 761, 215 P.3d 476, 481 (2009); *Bates v. Seldin*, 146 Idaho 772, 775-76, 203 P.3d 702, 705-06 (2009), the dissent argues that "[t]he majority opinion nonetheless contends that Liberty Mutual waived the issue by stipulating to Instruction 13 . . . ." We do not contend that Liberty Mutual waived the issue. We infer that Liberty Mutual did not raise on appeal the objections to these instructions because Liberty Mutual did not object to the instructions. In its argument, the dissent misses the point. It is the dissent, not Liberty Mutual, who contends on appeal that the district court erred in giving these instructions to the jury. The dissent continues, "There was no factual issue for the jury to settle. This is because '[m]ost courts reason . . . that the language "legally entitled to recover" is clear and unambiguous.'" Citing opinions from other jurisdictions, the dissent states, "There is no UM 'claim' until the claimant is ready to show the *extent of damages* caused by the tortfeasor or, stated another way, to show the full extent of damages the claimant is legally entitled to recover from the tortfeasor if he were insured." (Emphasis in original.)

The dissent bases its argument on opinions from other courts interpreting the words "legally entitled to recover." However, Liberty Mutual did not base its construction of the policy on how this Court should, or other courts have, construed those words. Rather, it based its argument on appeal on the fact that the words "payment" and "amount" were in the singular, rather than the plural, in the sentence beginning, "Our payment is based on the amount that an insured is legally entitled to recover . . . ." Liberty Mutual's entire argument in its opening brief on the interpretation of the wording in this sentence was as follows:

> The Policy provides: "Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle . . . ." "Payment" is singular. "Amount" is singular. Nothing in the Policy supports multiple payments; the Policy refers to one "payment" and one "amount." Thus, there was no contractual duty to make multiple, piecemeal payments before the Company can evaluate the UM claim in its entirety. (Emphasis in original.)

More importantly, when interpreting their insurance policies, we do not expect policyholders to know how most courts around the country have construed certain words or to have the knowledge of those who have spent their careers working in or with the insurance

23

industry. "'Unless contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—in order to effectuate the intent of the parties.'" *Armstrong v. Farmers Ins. Co. of Idaho*, 147 Idaho 67, 69, 205 P.3d 1203, 1205 (2009) (quoting from [*Howard v. Oregon Mut. Ins. Co.*, 137 Idaho 214, 217, 46 P.3d 510, 513 (2002)](#)).

In this case, Liberty Mutual misconstrued the policy as to its obligation to make payments under the MedPay coverage, and it contended that it did not have to pay any medical bills under the UM coverage until the MedPay coverage was exhausted. When asked during oral argument whether there was anything in the policy stating that a policyholder cannot receive payment under the UM coverage until the MedPay coverage was exhausted, Liberty Mutual's attorney answered, "Nothing specific." Liberty Mutual also contended that it did not have to pay anything under the UM coverage until the Weinsteins were ready to settle all damages recoverable under that coverage. During his trial testimony, one of Liberty Mutual's in-house counsel was asked whether the UM provision in the policy could have said that Liberty Mutual would not pay under the UM coverage "until the end of the claim, when all the bills come in and you're done with treatment and everything else." In answering the question, Liberty Mutual's counsel testified, "They could have. They didn't." During his testimony, Liberty Mutual's in-house counsel also agreed that "when a contract expresses no specific time for its performance, the law implies that it is to be performed within a reasonable time as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance."

"[B]ecause insurance contracts are adhesion contracts, typically not subject to negotiation between the parties, any ambiguity that exists in the contract must be construed most strongly against the insurer." *Armstrong*, 147 Idaho at 69, 205 P.3d at 1205. The language relied upon by Liberty Mutual and the language relied upon by the dissent occurs in a provision entitled "OUR OBLIGATIONS TO YOU." That paragraph is as follows:

> Uninsured Motorists Bodily Injury Coverage
> If you have these coverages (see your Declarations), we will pay up to our Limit Of Liability for bodily injury as described in How We Will Settle A Claim when an insured or an insured's car is struck by an uninsured motor vehicle or trailer. Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle because:

24

1. THE OWNER OR OPERATOR IS NOT INSURED
. . . .
2. THE COVERAGE OF THE OWNER OR OPERATOR IS DENIED
. . . .
3. THE ACCIDENT IS A HIT AND RUN
. . . .

The above-quoted provision states that Liberty Mutual "will pay up to our Limit Of Liability for bodily injury *as described in How We Will Settle A Claim*." (Emphasis added.) The portion of the policy entitled "How We Will Settle A Claim" has seven subsections, entitled: "1. Limit Of Liability-Bodily Injury: Each Person," "2. Limit Of Liability-Bodily Injury: Each Accident," "3. Arbitration," "4. Judgment," "5. Payments Reduced," "6. Other Insurance - Your Car," and "7. Other Insurance - Non-Owned Car (Includes A Substitute Car)." None of those subsections contains any provision stating either that no payments of medical bills will be made under UM coverage until the MedPay coverage is exhausted or that UM coverage will only be paid in a single payment that includes all damages that the insured is entitled to recover under that coverage. Indeed, if the provisions of the section entitled "How We Will Settle A Claim" included any such language, Liberty Mutual would have so argued, but it did not.

The policy language relied upon by Liberty Mutual and the language relied upon by the dissent are included in the sentence, "Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle . . . ." Giving those common, non-technical words the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage or expert knowledge of how the insurance industry operates, there is nothing in the policy supporting either Liberty Mutual's or the dissent's construction of the sentence. If Liberty Mutual wants its policy to provide that it does not have to pay anything under UM coverage until all damages recoverable under that coverage have been agreed upon or determined, then it must include such a provision. **Fairly debatable claim.** To prove the tort of insurance bad faith, an insured must prove that "the claim was not fairly debatable." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). Liberty Mutual contends that this claim was fairly debatable for four reasons.

First, it contends that whether it was required to make payments of the medical bills under UM coverage before settlement of the entire UM claim was a matter of first impression. It

25

mischaracterizes the issue. As Liberty Mutual's in-house counsel testified, the insurance policy does not state when payment is due under UM coverage. He also agreed that "when a contract expresses no specific time for its performance, the law implies that it is to be performed within a reasonable time as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance." This is a well-settled principle of law that was applicable to this case. The jury was not asked to find that insurance companies should be required by law to pay undisputed medical bills under UM coverage where there is no issue regarding liability for the accident. Rather, the issue was whether this well-settled principle of law applied when the insurance policy did not state when benefits would be paid under UM coverage. Liberty Mutual has not provided any legal argument as to why it should not.

In *Inland Group of Companies, Inc. v. Providence Washington Insurance Co.*, 133 Idaho 249, 985 P.2d 674 (1999), we upheld an award of punitive damages for the tort of bad faith where the insurance company had failed to timely pay the undisputed portion of its insured's claim under a fire insurance policy. The insurance policy contained an arbitration provision to resolve disputed claims, and one of the arguments raised by the insurance company was that it had no duty to pay under the policy until the insured complied with all provisions of the policy including arbitration. In rejecting that argument we stated, "The duty to act in good faith exists at all times during the settlement process. Furthermore, a claim for breach of the obligation of good faith and fair dealing is independent of a technical breach of the obligation to pay." *Id.* at 255, 985 P.2d at 680. We added, "The tort recognized by this Court in *White* [*v. Unigard Mutual Insurance Co.*, 112 Idaho 94, 730 P.2d 1014 (1986)] is grounded upon the breach of this independent implied contractual duty of good faith. It cannot be properly regarded as a claim for tortious breach of the explicit terms of the contract such as the duty to pay." 133 Idaho at 255, 985 P.2d at 680. In *Inland*, the insurance company also contended that it was entitled to rely upon its rights under the policy to request documentation and arbitrate disputed claims. In holding that it did not have the right to arbitrate all claims or demand unnecessary documentation, we stated, "The existence of a right to the arbitration of genuinely disputed claims and to request necessary documentation of claims cannot shield an insurer who demands arbitration of claims that are not genuinely disputed or requests unnecessary documentation merely to delay the settlement process." *Id.* at 256, 985 P.2d at 681. Similarly, Liberty Mutual's

contractual duty of good faith required that it timely pay the undisputed sums owing under the Weinsteins' insurance policy.

Second, it contends that "once Defendants received the medical records, a question arose as to whether Sarah may have reinjured or aggravated her injury." Liberty Mutual relies upon the testimony of a physician that it retained as an expert witness for trial. He testified that after Sarah completed her initial physical therapy and began playing soccer again, additional symptoms arose in her hip that ultimately led to the diagnosis of the labral tear and necessitated surgery. He also testified that although he does not know exactly when the labral tear occurred, the most likely cause is pushing the head of the femur into the socket; a head-on, motor vehicle collision would generate sufficient force to cause a labral tear; and it is reasonable to assume that the accident caused the injury. On cross-examination, he stated, "I think that the mechanisms that cause labral tears would lead one to the conclusion that the accident caused it." This is insufficient to overturn the jury's finding that the claim was not fairly debatable. Sarah's surgeon never received a request from Liberty Mutual for medical records.

In addition, Liberty Mutual paid under MedPay coverage about half of Sarah's hospital bill for the surgery to repair the labral tear. That payment exhausted the MedPay coverage. The jury could reasonably have concluded that because Liberty Mutual had paid about half of the bill under MedPay coverage, its refusal to pay the balance under UM coverage was not based upon any good faith belief that it was fairly debatable as to whether the labral tear was caused by the accident. The MedPay coverage only paid for medical services "because of bodily injury caused by a car accident, sustained by a covered person."

Third, Liberty Mutual argues "there was, and continues to be, a question of fact as to Sarah's future medical conditions, including whether Sarah will require a hip replacement due to the motor vehicle collision." The fact that there is uncertainty as to whether Sarah will need future surgery does not make her past medical expenses fairly debatable. The fact that a portion of the claim is fairly debatable does not justify failing to pay the undisputed portions.

Finally, Liberty Mutual asserts that "Plaintiffs never submitted a demand and proof for future medical expenses or Sarah's general damages, thus making those damages inherently debatable." The fact that the Weinsteins did not submit a demand and proof of loss for Sarah's future medical expenses and general damages does not make the amount of her actual medical expenses fairly debatable.

27

**Good faith mistake.** To prove the tort of insurance bad faith, an insured must prove that "the denial or failure to pay was not the result of a good faith mistake." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). In alleging there was insufficient evidence that its failure to pay the undisputed medical bills within a reasonable time was the result of a good faith mistake, Liberty Mutual again blames Bistline. It states, "If Defendants were mistaken in relying on the promise of Plaintiffs' counsel to provide the necessary records, such mistake was a good faith and honest mistake."

There was sufficient evidence from which the jury could believe that the unreasonable delay in paying the undisputed medical bills was based upon Liberty Mutual's policy of not doing so until the entire UM claim was settled and not upon any alleged lack of cooperation from Plaintiffs' counsel. If the information provided by the insured is sufficient to give the insurer an opportunity to investigate and determine its liability, "the insurer must investigate and/or determine its rights and liabilities," *Brinkman v. Aid Ins. Co.*, 115 Idaho 346, 350, 766 P.2d 1227, 1231 (1988), and must do so "in a fair and accurate manner," *Greenough v. Farm Bureau Mut. Ins. Co. of Idaho*, 142 Idaho 589, 593, 130 P.3d 1127, 1131 (2006). The adjuster handling this claim testified that Liberty Mutual had a duty to investigate the claim that was independent of whatever the insured's attorney does. Although Liberty Mutual points to the third medical authorization which was allegedly prepared by Bistline and which revoked the prior authorizations, the third medical authorization was sent to Liberty Mutual on November 19, 2003, over one year after the accident. Up to that time, Liberty Mutual had not attempted to use the two prior authorizations to obtain any medical records from any medical providers.

On September 2, 2003, the UM adjuster sent a fax to the MedPay unit asking for the MedPay file. At least some of the documents had initially been received by the adjuster and forwarded to the MedPay unit. In the fax, the adjuster wrote, "As I'm sure Mrs. Weinstein told you, they have collection agencies after them for Sarah's bills. Please get a copy of her med pay file to me ASAP. Med auth is enclosed." The MedPay unit did not respond to the fax. On November 20, 2003, the adjuster sent a letter to the MedPay unit. The letter began, "As part of our investigation of this claim, we request that you forward a complete copy of your Med Pay file for Sarah Weinstein. We have enclosed a signed authorization for this request." The MedPay unit did not respond to the letter. On April 20, 2004, the adjuster sent the MedPay unit a copy of the November letter, but the adjuster crossed out the date and wrote "4/20/04" and also

wrote at the top of the letter, "Second Request." The MedPay unit did not respond to this third request. On June 9, 2004, there was an internal note by the adjuster stating that she has still not received the MedPay file. The adjuster made a fourth request for the MedPay file, and it is not clear whether the MedPay unit ever responded to that request. The adjuster testified that she did not know why she had to request the MedPay file four times.

The third medical authorization was directed to the MedPay unit because the UM adjuster contended that she needed a medical authorization to have the MedPay unit send her the file. The adjuster testified that she never used the medical authorizations except to attempt to obtain the MedPay file. The adjuster's supervisor acknowledged that there was a problem getting the MedPay file back from the MedPay unit. He stated that had that problem been brought to his attention, he *may* have done something about it. (Emphasis added.) There was sufficient evidence to support the jury's finding that the failure to timely pay the undisputed medical bills from the UM coverage was not the result of a good faith mistake.

**Fully compensable by contract damages.** To prove the tort of insurance bad faith, an insured must prove that "the resulting harm is not fully compensable by contract damages." *Id*. Liberty Mutual contends that "[t]he only extra-contractual damages alleged or for which evidence was offered at trial were for Linda Weinstein's claimed emotional distress." This statement by Liberty Mutual is incorrect. The Weinsteins fourth amended complaint alleged, "As a direct and proximate result of the actions of the agents or employees of Defendants, Plaintiffs have suffered unnecessary and substantial emotional distress and mental anguish, their credit has been damaged and their family finances were damaged." There was evidence to support these allegations.

Liberty Mutual contends that the emotional distress suffered by Mrs. Weinstein in this case was not severe enough to constitute "harm" for the purposes of the tort of insurance bad faith. It relies upon the opinion of the Idaho Court of Appeals in *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282 (Ct. App. 1984), wherein the court held that testimony that the plaintiffs were "upset, embarrassed, angered, bothered and depressed" due to the defendants' wrongful conduct was not sufficient to show severe emotional distress because "[t]here is no competent evidence to show that the Davises incurred any physical damage or were hampered in the performance of their daily functions, nor did they demonstrate that they suffered a severely disabling emotional

response to the Gages' conduct." Liberty Mutual contends that Mrs. Weinstein merely suffered embarrassment, stress, and grief that sometimes caused her to cry and tension with her husband.

Whether or not the emotional distress is severe does not simply depend upon the label placed upon it. Emotional distress "includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Restatement (Second) of Torts*, § 46, comment j (1965) (quoted in *Evans v. Twin Falls County*, 118 Idaho 210, 220, 796 P.2d 87, 97 (1990). The issue is the severity of the emotional distress, not the label placed upon it.

In *Walston v. Monumental Life Ins. Co.*, 129 Idaho 211, 923 P.2d 456 (1996), we upheld the award of damages for insurance bad faith where the only element of extracontractual harm was emotional distress. In that opinion we referred to the holding in *Davis v. Gage*, stating, "The *Davis* Court concluded that evidence showing that the plaintiff was 'upset, embarrassed, angered, bothered and depressed' did not demonstrate a severely disabling emotional condition adequate for intentional infliction of emotional distress damages." 129 Idaho at 219-20, 923 P.2d at 464-65. We then held that there was sufficient evidence of severe emotional distress in *Walston* to support the damage award, stating:

> It is apparent that the $120,000 damage award consists of emotional distress damages. It is necessary to determine if Monumental's conduct was "extreme outrageous conduct" to support the damage award. In this case the jury could properly find that Monumental engaged in extreme outrageous conduct. After marketing a policy utilizing misrepresentations as to the scope and nature of its coverage, it denied coverage on a specious theory involving an interpretation of the term "treatment" that would exclude coverage for anybody who had check-ups following an incident of cancer. Monumental impugned Walston's character and drew him into a prolonged dispute when he was grieving the loss of his wife. The jury could reasonably determine that this was extreme outrageous conduct.

*Id*. at 220, 923 P.2d at 465.

In addressing together both the outrageousness of the insurer's conduct and the emotional distress suffered by the insured, this Court recognized that they are interrelated. "The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Restatement (Second) of Torts*, § 46, comment j (1965) (quoted in *Evans v. Twin Falls County*, 118 Idaho 210, 220, 796 P.2d 87, 97 (1990).

30

"It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id*. In this case, the district court determined that there was sufficient evidence to present to the jury the issue of whether either of the Weinsteins suffered severe emotional distress.

In denying Liberty Mutual's motion for a judgment notwithstanding the verdict, the district court wrote as follows:

> *In this case, the severity of Defendants misconduct coupled with the Weinstein's expectation of the contract satisfies the requirements of Walston*. The Defendants denied the Weinsteins' requests for payment and defended a policy of delaying the settlement of the UM claim, with knowledge that the Weinsteins were receiving phone calls from bill collectors and being threatened by medical providers. The Weinsteins entered into the contract expecting that the Defendants would protect them in their time of need. The Weinsteins presented evidence that they suffered from embarrassment, harassment by bill collectors, from internal family strife, and overall misfortune and distress in their life as a result of the Defendants failing to meet their contractual obligations. Mrs. Weinstein experienced depression and crying. The jury was instructed on this element, and found that the emotional distress was severe. The Weinsteins met their burden to prove their harm was not fully compensable by contract damages. (Emphasis added.)

In denying Liberty Mutual's motion for a new trial, the district court wrote as follows:

> From May 2003 on, Mrs. Weinstein continued to receive regular phone calls and letters from medical billing departments and collection agencies regarding overdue medical bills. These events caused her to feel depressed and cry. The grief, stress, and constant embarrassment resulted in marital discord and family turmoil. On one occasion, as Mrs. Weinstein was leaving a doctor's office following Sarah's visit, a staff member informed her that if she did not pay her outstanding bill in full immediately, Sarah would no longer receive treatment. This was stated at a loud volume in front of other staff and patients, and Mrs. Weinstein was very upset to have her financial affairs publicized. Although Mrs. Weinstein notified Defendants of this incident, they did nothing. *This Court observed Mrs. Weinstein's demeanor at trial and the court believes she was deeply disturbed by the harassment of bill collectors and Defendant's unresponsiveness to her pleas for assistance.* (Emphasis added.)

In addition, the Weinsteins had liens placed on their house by Sarah's medical providers. There was sufficient evidence of severe emotional distress caused by Liberty Mutual and of extracontractual damages. We hold that the district court did not err in denying Liberty Mutual's motions for a directed verdict, judgment notwithstanding the verdict, and new trial.

**E. Did the District Court Err in Failing to Grant Liberty Mutual's Motions for a Directed Verdict, Judgment Notwithstanding the Verdict, or New Trial Because the Weinsteins Failed to Prove or Mitigate Their Damages?**

Liberty Mutual moved for a new trial on the grounds that the damages awarded were excessive, appearing to have been given under the influence of passion or prejudice, and that there was insufficient evidence to justify them. When ruling on a motion premised upon inadequate or excessive damages, the trial court compares the jury's award to what the court would have given, based upon its weighing of the evidence. *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 506, 95 P.3d 977, 988 (2004). Unless the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the award must stand. *Id*. In order to grant a new trial based upon the insufficiency of the evidence, "the trial court must determine both (1) the jury verdict is against the clear weight of the evidence, and (2) a new trial would produce a different result." *Heitz v. Carroll*, 117 Idaho 373, 378, 788 P.2d 188, 193 (1990). The district court conducted the appropriate review and determined that the damages were similar in amount to what it would have awarded and were supported by sufficient evidence.

**1. Damage award of $250,000 to Sarah.** Sarah was entitled to recover under the UM coverage the amount she was "legally entitled to recover for bodily injury" from the uninsured driver. The district court instructed the jury that the elements of noneconomic damage they were to consider were: "One, the nature of the injuries; two, the physical or mental pain and suffering, past and future; three, the impairment of abilities to perform usual activities; four, the disfigurement caused by the injuries; five, the aggravation caused to any preexisting condition." The jury awarded her $250,000 in damages.

Liberty Mutual contends that Sarah's damages were excessive and/or unsupported by the evidence. It contends that her damage award "was based on a minimal impairment and possible need for future hip replacement surgery." Liberty Mutual's argument ignores the facts. The evidence was that Sarah has chronic hip pain that was not alleviated by the surgery and is not likely to improve. As a result, she has to limit her favorite activities of running and playing soccer. Considering her life expectancy, Sarah's damages were supported by the evidence. The

32

district court did not abuse its discretion in refusing to grant a new trial on the ground that the jury's award of damages to Sarah was excessive.

**2. Damage award of $210,000 to the Weinsteins.** The jury awarded the Weinsteins the sum of $210,000. The only argument that Liberty Mutual makes with regard to the excessiveness or insufficiency of the evidence to sustain this award is, "As already noted, the evidence was insufficient as a matter of law to support a claim of intentional emotional distress." We held above that there was sufficient evidence of severe emotional distress to support an award of damages for intentional infliction of emotional distress. The district court did not abuse its discretion in refusing to grant a new trial on the ground that the Weinsteins' damages were excessive.

**3. Failure to mitigate damages.** Liberty Mutual moved for a judgment notwithstanding the verdict with respect to the Weinsteins' award of damages for bad faith on the ground that, as a matter of law, they failed to mitigate their damages. "[A] plaintiff who is injured by actionable conduct of a defendant is ordinarily denied recovery for damages which could have been avoided by reasonable acts, including reasonable expenditures, after actionable conduct has taken place." *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 261, 846 P.2d 904, 912 (1993). "When ruling on a judgment notwithstanding the verdict, a court must determine whether, as a matter of law, the jury's verdict was supported by evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury." *Bates v. Seldin*, 146 Idaho 772, 776, 203 P.3d 702, 706 (2009). "A trial court is not free to weigh the evidence or pass on the credibility of witnesses, . . . [and it must] draw[] all reasonable inferences in favor of the non-moving party." *Id.* at 774-75, 203 P.3d at 704-05.

During the trial, Mrs. Weinstein testified that the Weinsteins sold property in Florida one year after the accident for which they received net proceeds of $175,000 and that the following spring Mr. Weinstein received an inheritance. Liberty Mutual contends that the Weinsteins failed to act reasonably in mitigating their damages because they could have used these monies to replace the sums Liberty Mutual wrongfully refused to pay for Sarah's medical expenses.

In denying the motion for a judgment notwithstanding the verdict based upon the Weinsteins' alleged failure to mitigate their damages, the district court reasoned as follows:

> The Weinsteins did not receive any inheritance until one year after the accident. This was after Defendants refused to investigate or pay medical bills, and after Mrs. Weinstein had begun to receive threatening phone calls from

33

medical providers and collection agencies. The jury could reasonable believe that prior to the inheritance, the Weinsteins could not mitigate their injuries, and that the bad faith had already been committed. Also there was no evidence presented to show that the inheritance eased their financial obligations. Finally, the jury was provided with a jury instruction on mitigation and could have found that the Weinsteins' choice to not use the inheritance money to pay the overdue bills was reasonable under the circumstances.

In addition, Mrs. Weinstein testified that during the year following the accident, Mr. Weinstein's business was struggling, there was no money coming in, they had obtained a second mortgage on their house, and they were living off their credit cards. Liberty Mutual did not attempt to show what the Weinsteins did with the money from the land sale and the inheritance. It had the burden of proving that the Weinsteins did not act reasonably to mitigate their damages. *Davis v. First Interstate Bank of Idaho, N.A.*, 115 Idaho 169, 170, 765 P.2d 680, 681 (1988). The district court did not err in denying the motion for a judgment notwithstanding the verdict on the ground that the Weinsteins had failed to take reasonable actions to mitigate their damages.

**F.  Did the District Court Err in Awarding Sarah Attorney Fees Pursuant to Idaho Code § 41-1839?**

The district court awarded $89,840.19 in attorney fees to Sarah pursuant to Idaho Code § 41-1839(1).  It based the award on the total damages awarded to Sarah.  Liberty Mutual challenges the award on the ground that the Weinsteins "never submitted a proof of loss for Sarah's future medical expenses or general damages," and therefore they did not meet the condition precedent for an award of attorney fees for recovering those damages.

The statute "contains two requirements for an insured to be entitled to an award of attorney fees:  (1) the insured must provide a proof of loss as required by the insurance policy; and (2) the insurer must fail to pay the amount justly due within thirty days after receipt of the proof of loss." *Parsons v. Mutual of Enumclaw Ins. Co.*, 143 Idaho 743, 746-47, 152 P.3d 614, 617-18 (2007).

"As defined by this Court, a submitted proof of loss is sufficient when the insured provides the insurer with enough information to allow the insurer a reasonable opportunity to investigate and determine its liability." *Greenough v. Farm Bureau Mut. Ins. Co. of Idaho*, 142 Idaho 589, 593, 130 P.3d 1127, 1131 (2006).  It must also mention a specific sum so that a tender

can be made, *Associates Discount Corp. of Idaho v. Yosemite Ins. Co.*, 96 Idaho 249, 257, 526 P.2d 854, 862 (1973), or provide the basis for calculating the amount of the claimed loss, *Boel v. Stewart Title Guar. Co.*, 137 Idaho 9, 14, 43 P.3d 768, 773 (2002) (demand for payment of existing mortgage sufficient even though amount owing on the mortgage was not mentioned).

Prior to the filing of this lawsuit, the Weinsteins only demanded payment of medical bills. Mrs. Weinstein submitted medical bills to Liberty Mutual, and Bistline sent two letters to Liberty Mutual listing medical bills to be paid. In the first letter, dated October 28, 2003, Bistline stated that he was "tendering medical bills which need to be paid to avoid damage to my clients' credit and which are creating a financial hardship for them." In the second letter, dated April 20, 2004, he sent medical bills and records up to November 20, 2003. He wrote, "Please consider this a proof of loss for medical expenses incurred on behalf of Sarah Weinstein through November 20, 2003." The letter concluded, "We will work over the next few weeks to get up to date medical records and some sort of prognosis from the physician which could provide the basis for a proof of loss as to future medical expenses."

The Weinsteins filed this lawsuit on July 7, 2004. Prior to doing so, they did not submit anything that could be construed as a proof of loss for Sarah's future medical expenses or her general damages. The initial complaint alleged two causes of action: (a) an action for a declaratory judgment that Sarah was a third party beneficiary under the policy and (b) an action for breach of contract seeking all damages that Sarah would be entitled to recover under the UM coverage of the policy. The complaint alleged that two "proofs of loss for past unpaid medical expenses" had been submitted, "one in October of 2003, and the other in April of 2004," which apparently referred to the two letters discussed above. The Weinsteins have not pointed to anything that would constitute a demand for payment of any damages other than past medical bills.

In *Hansen v. State Farm Mutual Automobile Insurance Co.*, 112 Idaho 663, 735 P.2d 974 (1987), an insured who had MedPay and UM coverage was involved in an accident with an uninsured motorist. The insured provided medical bills to his insurance company, and it paid them from the MedPay coverage. About two months after the accident, the insured's attorney informed the adjuster that the insured had lost his job as a result of the injuries he received in the accident. The adjuster asked for medical records and employer reports to support the lost income, but the attorney failed to provide that information. About five months later, without

making any additional demand, the insured filed a lawsuit to recover damages payable under the UM coverage. The jury found in favor of the insured and his wife, and the trial court awarded attorney fees pursuant to Idaho Code § 41-1839. On appeal we reversed the award of attorney fees because the insured had not provided a proof of loss for damages exceeding the medical benefits, which had been paid under the MedPay coverage. In doing so, this Court stated as follows:

> The only information provided to State Farm by the Hansens prior to initiating their lawsuit were routine doctor bills which were paid by State Farm under the medical coverage provisions of the policy. The record contains no evidence that Hansens provided any reports from physicians or Mr. Hansen's employer regarding his loss of employment or regarding any loss suffered by Mrs. Hansen apart from the medical bills submitted to and paid by State Farm, nor was any written demand made upon State Farm under the uninsured motorist coverage prior to filing suit. We therefore reverse the decision of the district court awarding attorney fees to the Hansens.

112 Idaho at 671, 735 P.2d at 982 (footnote omitted).

The jury's award did not include any sums owing for medical bills.[3] According to the Weinsteins' exhibit offered at trial, Sarah's medical bills totaled $16,424.07. All of them, except a bill incurred on June 25, 2007, for $268.00, were incurred prior to the date this action was filed. Liberty Mutual paid $5,000.00 in medical bills from the MedPay coverage and $3,072.71 in medical bills from the UM coverage, with the last such payment being made on September 29, 2004. On January 5, 2005, Liberty Mutual paid the Weinsteins the sum of $80,000. The letter of enclosure stated that the payment consisted of $60,000 as Liberty Mutual's evaluation of Sarah's injuries,[4] $17,000 as prejudgment interest, and $3,000 for attorney fees. The $60,000 would include any sums Sarah was entitled to recover under UM coverage for medical expenses that exceeded the $5,000 paid in MedPay coverage. Thus, by the time of trial Liberty Mutual had paid all sums owing for Sarah's medical bills.

The district court's award of attorney fees under Idaho Code § 41-1839 was based upon a contingent fee for Sarah's entire recovery, which included sums in addition to medical expenses.

---

[3] The jury instructions regarding the elements of recoverable damages did not include past medical expenses.

[4] This sum would be Liberty Mutual's evaluation of the amount Sarah was entitled to recover under the UM coverage, which would include any medical bills exceeding the $5,000 in MedPay coverage.

Because she did not submit a proof of loss for anything but medical expenses, she cannot be awarded attorney fees under section 41-1839 for Liberty Mutual's failure to pay any sums except medical expenses that had remained unpaid prior to the filing of this lawsuit for at least thirty days after Liberty Mutual's receipt of a sufficient proof of loss. Therefore, we vacate the award of attorney fees and remand this case for the district court to recalculate the appropriate award. The $3,000 paid by Liberty Mutual for attorney fees must also be applied to any new award.[5]

## G. Did the District Court Err in Refusing to Apply Idaho Code §§ 6-1604(1) & (3) to this Action?

In 2003, the legislature amended Idaho Code § 6-1604 by adding subsection (3) which limits a judgment for punitive damages to the greater of $250,000 or three times the compensatory damages. Ch. 122, § 3, 2002 Idaho Sess. Laws, 370, 371-72. The legislation also changed the standard of proof by amending subsection (1) to provide that conduct required to support an award of punitive damages must be proved by clear and convincing evidence rather than by a preponderance of the evidence. *Id*. Those amendments applied to causes of action that accrue after July 1, 2003. *Id*. at § 6, 372.

In its motion for a remittitur or, in the alternative, a new trial, Liberty Mutual contended that the 2003 amendments applied to this lawsuit. The district court denied that request, reasoning as follows:

> The Court deems the bad faith treatment of the Weinsteins' UM claim to be a continuous tort that began when Mrs. Weinstein reported the accident and provided Defendants with medical authorizations. It is neither fair nor realistic to pinpoint the exact moment when the bad faith delay claim arose. However, there are many reasons for applying the pre-July 2003 statute. Defendants determined that the uninsured motorist was 100 percent at fault almost immediately after the accident. At that point, Defendants began to deliberately delay settlement of the UM claim, pursuant to the existing policy to pay nothing on UM claims until the end—regardless of how long the Weinsteins would have to wait. The UM adjusters did nothing with the medical releases, and numerous bills were denied before July 1, 2003. Mrs. Weinstein received calls from bill collectors in January, 2003. The UM claim received no attention, despite Mrs. Weinstein's complaints, and the Med Pay portion was inactivated.

---

[5] The letter of enclosure did not indicate that the $3,000 payment for attorney fees was based upon an agreement

Liberty Mutual makes three arguments in support of its contention that the district court erred in failing to grant a remittitur or a new trial on the ground that the 2003 amendments to Idaho Code § 6-1604 apply to this case.

First, it argues, "According to the Plaintiffs' Complaint, there were no acts of bad faith relating to the UM coverage until after July 1, 2003." It is not clear from this statement which complaint Liberty Mutual means. It cites the hearing held on April 25, 2007, during which the district court expressed doubt as to whether the second amended complaint alleged bad faith in connection with the handling of MedPay coverage, and it therefore permitted the Weinsteins to file a third amended complaint to make that issue clear. If Liberty Mutual is referring to the second amended complaint, or even the original complaint, its argument is irrelevant. "The amendment of the complaint supersedes the original complaint and all subsequent proceedings are based upon the amended complaint." *W.L. Scott, Inc. v. Madras Aerotech, Inc.*, 103 Idaho 736, 739, 653 P.2d 791, 794 (1982). The Weinsteins filed the third amended complaint, and then a fourth amended complaint to add the request for punitive damages. Thus, the relevant complaint for this analysis is the fourth amended complaint.

If Liberty Mutual is referring to the fourth amended complaint, its argument is simply untrue. That complaint clearly alleges acts of bad faith occurring before July 1, 2003. The Weinsteins alleged that Sarah's medical bills should have been promptly paid out of both coverages. The allegation was, "Policy #616A895407 contained medical payments and uninsured motorist benefits coverage, all of which required that the medical expenses incurred by Sarah would be paid promptly by the Defendants." They also alleged a breach of both provisions of the policy, stating, "The Defendants wrongfully and unreasonably denied and delayed payments of Sarah's medical bills submitted under policy #616A895407. Both the medical payments provisions of the policy and the uninsured motorist provisions of the policy required that the Defendants promptly pay Sarah's medical bills." Finally, they alleged various acts of bad faith occurring from the beginning of Liberty Mutual's handling of this claim. Those allegations were as follows:

> 34. Defendants, through their agents and employees, in evaluating and adjusting the Plaintiffs' claims for the benefits under the policy, intentionally and unreasonably denied or delayed adjustment of the claim and payment of all

among the parties that such sum was a reasonable fee for obtaining payment of Sarah's medical expenses.

benefits due under policy #616A895407 by engaging in unfair and unreasonable behavior including, <u>but not limited to:</u>

    A.  Misrepresenting pertinent facts and insurance policy provisions;

    B.  Failing to acknowledge and to act reasonably promptly on communications with respect to a claim;

    C.  Failing to adopt or implement reasonable standards for prompt investigation of a claim;

    D.  Refusing, despite repeated requests, to pay claims which any reasonable investigation would have demonstrated were payable;

    E.  Failing to affirm or deny coverage within a reasonable time of being advised of the loss;

    F.  Making no attempt to effectuate prompt, fair, and equitable settlement of a claim after having determined that liability was reasonably clear;

    G.  Leaving the insured with no choice to [sic] but to either forego policy benefits or retain an [sic] lawyer and initiate litigation;

    H.  Delaying investigation and payment of claims pending obtaining information which the insured and others had already supplied, and by making no reasonable effort to pursue information made available to it, on more than one occasion, by the insured;

    I.  Forcing the insured to process claims under a portion of the policy which was by its application more favorable to Defendants, in that they delayed and limited payment and deferred part of the loss onto other insurers and individuals, even after liability for payment under the medical payment and uninsured motorist provisions of the policy was reasonably clear;

    J.  Erroneously advising the insured, who had reported experiencing financial distress as a result of medical bills that Defendants had not paid, that the bills would not be paid until the insured agreed to a settlement of the entire claim;

    K.  Refusing to make payments due under the policy unless and until the insured entered into agreements which were unnecessary and potentially adverse to the insured interests; and,

    L.  Failing to provide the insured with a reasonable explanation of the basis in the policy in relation to the facts or applicable law for delaying or refusing payment of the known or reasonably ascertainable losses.

35.    In adjusting and handling all aspects of the claims arising out of the occurrence of the automobile accident of September 30, 2002, and arising out of the claims made under policy #616A895407, the Defendants committed the tort of bad faith. The Defendants intentionally and unreasonably denied or withheld payments of the claims arising out of the occurrence of the automobile accident described herein and arising out of the transaction of adjusting the claims relating thereto under policy #616A895407. The claims were not fairly debatable. The denial or failure to pay was not the result of a good faith mistake. The resulting harm is not fully compensable by contract damages.

Second, Liberty Mutual argues, "[A]ccording to Plaintiffs' theory of the case, there were no *damages* stemming from those acts until bills were submitted for payment under the UM provisions of the policy and not paid." (Emphasis in original.) Liberty Mutual contends that this did not occur until October 28, 2003, when Bistline sent a letter stating that he was not aware of any reason why the unpaid bills could not be paid out of the UM coverage. Liberty Mutual misstates the Weinsteins' theory of the case. Their theory of the case was that Liberty Mutual was required to pay the bills in a timely manner under any available coverage, whether it was MedPay coverage or UM coverage. There is nothing in the policy requiring the insured to designate the coverage from which medical bills are to be paid. When Mrs. Weinstein called to report the accident and later submitted medical bills for payment, she did not designate the coverage that she wanted applied to those bills. Liberty Mutual has asserted that its normal policy was to exhaust MedPay coverage before paying medical bills under UM coverage, but it admitted during oral argument that the policy does not contain any such provision.

Finally, it points out, "The jury found that there was no bad faith as to the MedPay claim." Liberty Mutual apparently contends that because the jury did not find bad faith in the handling of the MedPay coverage, any bad faith could not have occurred until MedPay benefits were exhausted by the payment on September 3, 2003. Liberty Mutual contended, and offered expert testimony opining, that its delay in paying medical bills under MedPay coverage was due to its reasonable, fairly-debatable, honest, good-faith mistake in interpreting the insurance policy to require that medical bills would not be paid under MedPay coverage until they were first submitted to the insured's health insurance carrier and either denied or only partially paid. There was no contention that such misinterpretation applied to the payment of medical bills under UM coverage. Therefore, the jury could have found no bad faith as a result of the delay in paying medical bills under the MedPay coverage, but bad faith for the delay in paying the same bills under UM coverage.

## H. Did the District Court Err in Failing to Grant a New Trial on the Ground of Juror Misconduct?

After the jury had returned its verdict, Liberty Mutual discovered that one of the jurors had a policy of automobile insurance from Liberty Mutual that was in effect from November 17, 2006, through November 17, 2007. The juror had been a policyholder of Liberty Mutual for

several years and had made a claim under a policy in December 2004. That juror was among the nine jurors who voted in favor of the Weinsteins.

Jury selection was on Friday, September 14, 2007. The following day, the juror asked his wife who their insurance company was, and she told him it was Liberty Mutual. On Monday morning before the trial started, the juror told his fellow jurors that he was insured by Liberty Mutual and asked them what he should do. They felt he could be honest, and he did not bring it to the court's attention. After the trial was concluded, Liberty Mutual discovered that the juror was one of its policyholders. It moved for a new trial on the ground of juror misconduct. The juror was called to testify. He stated that during voir dire he was focused on missing work and had forgotten who his insurance company was. He said his wife handled the insurance.

To obtain a new trial on the ground that a juror failed to accurately answer a question during *voir dire*, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). "When reviewing a decision on a new trial based on juror misconduct, this Court applies an abuse of discretion standard." *Levinger v. Mercy Med. Ctr.*, *Nampa*, 139 Idaho 192, 196, 75 P.3d 1202, 1206 (2003).

The first issue addressed by the district court was whether the juror was dishonest during *voir dire*. Dishonest is not the equivalent of wrong or mistaken. *McDonough Power Equip.*, 464 U.S. at 555. We do not have a transcript of the *voir dire*, but the district court in its opinion stated what the question was. The court asked the entire jury panel whether any of them "personally knew the parties." The juror did not respond to that question.

The question that the juror allegedly did not answer honestly was asked by the court to the entire panel. It was whether anyone personally knew the parties. The average person could construe that question as referring to knowing people who are parties, not corporations. One would not think of "personally knowing" a corporation, as opposed to knowing of a corporation. The district court found that the juror "did not personally know Defendants; he did not even realize that he was a policyholder, therefore his lack of response was honest." Because one juror responded to the court's question by stating he was a policyholder and was excused, Liberty Mutual contends that this juror should have understood the court's question to include whether any jurors were policyholders of Liberty Mutual. That argument simply shows that vague

41

questions can be interpreted differently. If Liberty Mutual was concerned that any of its policyholders would be on the jury, it should have asked that question.

The district court also found that there was no showing that the juror was biased against Liberty Mutual. Although the juror had made a claim against his insurance policy nearly three years before trial, he testified that his wife handled that claim. Although he talked to someone on the telephone, he thinks that either his wife made the call or simply gave him a telephone number to call. The district court found that the juror "stated that he was satisfied with the outcome and held no grudges or bias against Liberty Mutual. Since [the juror] remained with Liberty after the accident, his statement that he was not upset with Liberty appears truthful."

The district court denied Liberty Mutual's motion for a new trial on the ground of juror misconduct. The court found that the juror was not dishonest and was not biased against Liberty Mutual. The district court's findings are supported by substantial, competent evidence. Liberty Mutual has failed to show that the court abused its discretion.

## I. Should this Court Vacate the Award of Punitive Damages on the Ground that the Weinsteins Failed to Prove Unconscionable Conduct by Clear and Convincing Evidence?

Liberty Mutual states, "The amended version of Idaho Code § 6-1604(1) required Plaintiffs to 'prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.'" It then argues, "Because the legal standard with respect to payment of UM benefits is so opaque, the Plaintiffs simply could not - and did not - adduce sufficient evidence to prove 'by clear and convincing evidence' that Defendants acted oppressively or outrageously." It adds in a footnote, "Even under the pre-amended statute's 'preponderance of the evidence' standard, the Plaintiffs failed to justify the imposition of punitive damages. As explained above, Defendants were charting new territory with this claims process."

The issue in this case did not involve "the legal standard with respect to payment of UM benefits." It involved the legal standard for making payments owing under a contract when the contract does not specify when those payments are to be made. The well-established law in Idaho is, "Where no time is expressed in a contract for its performance, the law implies that it shall be performed within a reasonable time as determined by the subject matter of the contract,

42

the situation of the parties, and the circumstances attending the performance." *Curzon v. Wells Cargo, Inc.*, 86 Idaho 38, 43, 382 P.2d 906, 908 (1963).

**J. Should the Award of Punitive Damages Be Set Aside Due to Errors in Jury Instructions and in Admitting Evidence?**

Liberty Mutual contends that the award of punitive damages must be set aside because of errors made by the district court in allowing certain evidence and arguments and in instructing the jury. We will address each of these alleged errors.

**1. "The court erred by allowing the jury to consider evidence of potential harm to others."** In *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007), the Supreme Court held that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.,* injury that it inflicts upon those who are, essentially, strangers to the litigation." Evidence of harm to nonparties is admissible to show the reprehensibility of the defendant's conduct. *Id.* at 355. However, "the Due Process Clause requires States to provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." *Id.*

Liberty Mutual asserts that "[t]he [district] court erred by allowing the jury to consider evidence of *potential* harm to others." (Emphasis in original.) According to Liberty Mutual, "[T]o incite the jury to award disproportionate punitive damages, Plaintiffs raised the specter that others would suffer at the hands of Defendants or other insurance companies in a way similar to Plaintiffs. The court erred in allowing the Plaintiffs to pursue this line of argument concerning *potential* harm to non-parties." (Emphasis in original.) Before addressing Liberty Mutual's arguments, it may be helpful to clarify what the Supreme Court means by "potential harm." Liberty Mutual may incorrectly equate potential harm with deterrence.

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996). Deterrence refers to deterring the defendant and others within the state from engaging in similar wrongful conduct in the future. In *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 19 (1991) (bracketed word added by the Court), the Supreme Court stated that it had "carefully reviewed" jury instructions that described the purpose of punitive

damages as "to punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future" and stated that such instructions "enlightened the jury as to the punitive damages' nature and purpose." In *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007) (emphases in original), the Supreme Court stated with respect to punishment as follows:

> Finally, we can find no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others. We have said that it may be appropriate to consider the reasonableness of a punitive damages award in light of the *potential* harm the defendant's conduct could have caused. But we have made clear that the potential harm at issue was harm potentially caused *the plaintiff*.

The reference to "potential harm" was not referring to deterrence. It refers to "'*the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred,'" or, stated differently, "the harm to the victim that would have ensued if the tortious plan had succeeded." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 581 (1996) (quoting from *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460 (1993) (emphasis in original). Thus, potential harm refers to harm that may occur or could have occurred from the defendant's past wrongful conduct, not harm that could result from future similar wrongful conduct by the defendant or others if they are not deterred from engaging in that conduct.

Liberty Mutual does not point to any place in the record where the district court permitted Plaintiffs to argue that the jury should award punitive damages to punish it for harm caused or potentially caused to nonparties. First, Liberty Mutual contends:

> Despite a standing objection from Defendants, Plaintiffs' counsel made references to the insurance industry as a whole (outside of Idaho) throughout each stage of the trial. In opening, Plaintiffs' counsel argued to the jury that the "insurance industry is an extremely important industry to Idahoans, and to Americans," that there are thousands of insurance companies, that the fifty state insurance commissioners fail to police insurance companies' claims practices, and that only juries can regulate these companies. (Citations to record omitted.)

The standing objection to which Liberty Mutual refers was not a standing objection to evidence or argument "throughout each stage of the trial." It was a standing objection to statements made by the Weinsteins' counsel during his opening statement. The statements objected to had nothing to do with asking the jury to punish Liberty Mutual for harm it has inflicted upon nonparties. The first statements were, "This is an important case. It's a landmark

44

case. There's a lot of people that are watching. In fact, the whole insurance industry that does business in the state of Idaho." At this point Liberty Mutual's counsel interrupted by objecting, "I do not believe that anybody's on trial except the particular defendants in this particular courtroom." When the district court responded that the Weinsteins' counsel was only saying that "people were watching this case," Liberty Mutual's attorney added, "It's argumentative." The district court overruled the objections. The Weinsteins' counsel then stated that this case was "being watched by every company that does business in the State of Idaho." Liberty Mutual's attorney again objected, stating, "Same objection, Your Honor." The court overruled the objection. The Weinsteins' counsel then told the jury that their reward for their time spent would be affecting "the way insurance companies handle claims in the future, and most importantly, ultimately, the security, the protection, and well-being of Idahoans who buy this kind of insurance." Liberty Mutual's counsel interrupted, stating, "Same objection, Your Honor. Could I have a standing objection to this argument regarding the industry? I won't interrupt anymore." The court answered, "All right. Thank you."

The comments by the Weinsteins' counsel could not reasonably be construed as attempting to influence the jury to award punitive damages to punish Liberty Mutual for injury that it may have inflicted upon nonparties. Counsel was talking about the jury's verdict deterring similar conduct in the future. In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996), the Supreme Court stated, "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." The *Philip Morris* Court identified the issue for its decision as "whether the Constitution's Due Process Clause permits a jury to base that award in part upon its desire to *punish* the defendant for harming persons who are not before the court (*e.g.,* victims whom the parties do not represent)." 549 U.S. at 349 (emphasis in original). The issue was *punishing* the defendant for harming nonparties, not *deterring* similar conduct by others.

Second, Liberty Mutual states, "Thereafter, Plaintiffs' counsel continued to blur the line between insurance companies operating in Idaho and the nationwide insurance industry throughout the trial." Assuming this is correct, Liberty Mutual does not point to any example of such blurring that could reasonably be construed as attempting to convince the jury to punish Liberty Mutual for harm caused to nonparties, nor does it point to an objection that the district court overruled. In a footnote to the above-quoted statement, Liberty Mutual alleges, "Plaintiffs'

expert, Dr. Norma Nielson, testified *over Defendants' objection* as to the insurance industry on a nationwide basis . . . ." (Emphasis added.) In the portion of the transcript cited by Liberty Mutual as supporting this statement, there was no testimony over its objection. It objected, and the question was withdrawn. What actually occurred was as follows:

> MR. RISCH: Q. Okay. And how – when you look at the Department of Insurance, what – where do they direct their – the majority of their resources in this regulation scheme that you're talking about?
> MR. COLLAER: Your Honor, I'm going to object to the relevancy of this and the foundation. She's talking in general throughout the country. That's not relevant to this state law.
> MR. RISCH: Let me rephrase the question.
> THE COURT: Okay.
> Q. BY MR. RISCH: In the state of Idaho, just taking our office, is it fairly typical as far as state agencies go?
> A. I would say it's fairly typical for a small state.

Finally, Liberty Mutual points to statements made by the Weinsteins' counsel in his closing argument. The first statement cited by Liberty Mutual was that punitive damages "has nothing to do with compensating the Weinsteins for what happened in this case. It all has to do with one thing, and that is regulating the conduct of this company and any other company who's thinking that they can do this sort of thing." The second statement was that the people on the jury "are the most important thing that is going to affect the insurance industry for a long time to come." Even if we were to assume that these statements could be construed as attempting to influence the jury to punish Liberty Mutual for harm it caused to nonparties, Liberty Mutual did not object to either statement, move for a mistrial, or seek a cautionary instruction. Therefore, any issue regarding those statements is not preserved for appeal. *Rojas v. Lindsay Mfg. Co.*, 108 Idaho 590, 592, 701 P.2d 210, 212 (1985).

The district court instructed the jury, "You may not assess an amount of punitive damages against these defendants to punish them for injury they may have inflicted on others who are not a party to this lawsuit." We must presume that the jury followed the jury instructions in arriving at their verdict. *Boll v. State Farm Mut. Auto. Ins. Co.*, 140 Idaho 334, 341, 92 P.3d 1081, 1088 (2004). The district court did not allow the jury to award punitive damages based upon potential harm to others.

Liberty Mutual does state in its brief, "In this case, the Plaintiffs focused the jury's attention on potential injuries that the Defendants and the entire insurance industry might

46

*someday* inflict on other insureds." (Emphasis added.) Its use of the word "someday" in reference to when the potential harm may be inflicted may be Liberty Mutual confusing potential harm with deterrence. Thus, it may be arguing that the Weinsteins attempted to convince the jury to base its award of punitive damages upon the need to deter similar conduct outside the State of Idaho. As the Supreme Court stated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 572 (1996), "We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." In the instant case, the district court instructed the jury, "You may assess punitive damages for the purpose of changing the defendants' or others' behavior in the State of Idaho, but you may not assess punitive damages with the intent and purpose of changing defendants' or others' conduct in other states or outside the State of Idaho." If that is what Liberty Mutual was arguing, the district court properly instructed the jury that it was not to seek to change the conduct of either Liberty Mutual or others occurring outside the state. As stated above, we must presume that the jury followed the jury instructions in arriving at their verdict.

**2. "The court erred by refusing to give Defendants' proposed punitive damages instructions."** Liberty Mutual asserts that the district court erred when it "refused to give Defendants' proposed punitive damage instruction and opted instead for constitutionally deficient instructions." The instruction that Liberty Mutual contends should have been given stated as follows:

> In deciding what amount, if any, of punitive damages to award, you may consider only the specific conduct by defendants that injured Leslie and Linda Weinstein. You may not punish defendants for conduct or practices that did not affect Leslie and Linda Weinstein, even if you believe that such conduct or practices were wrongful or deserving of punishment. The law provides other means to punish wrongdoing unrelated to Leslie and Linda Weinstein.

The district court refused to give the instruction, and Liberty Mutual contended in its motion for a new trial that such refusal was an error in law occurring during the trial. In denying the motion for a new trial, the district court held that the instruction was "sufficiently covered" and "untimely requested."

Rule 51(a)(1) of the Idaho Rules of Civil Procedure provides:

No later than five (5) days before the commencement of any trial by jury, any party may file written requests that the court instruct the jury on the law as set forth in such request, and such requested instructions must be served upon and received by all parties to the action at least five (5) days before the commencement of the trial. *The court shall not be required to consider any requested instructions not filed and served upon the parties as required by this rule*, but the court may reasonably permit any party to file and serve written requests for instructions at any time up to and including the close of the evidence at the trial upon the grounds that such requested instructions concern matters arising during the trial of the action which could not reasonably have been anticipated by the party requesting such instructions or were overlooked in the original requested instructions. (Emphasis added.)

Liberty Mutual did not submit this instruction "[n]o later than five (5) days before the commencement of [the] trial by jury," as required by Rule 51(a)(1). It submitted the instruction on September 25, 2007, the day on which Liberty Mutual rested its case. It also does not argue that the instruction "concern[ed] matters arising during the trial of the action which could not reasonably have been anticipated" by it, or that the instruction was "overlooked in the original requested instructions." Thus, it has not shown that the district court abused its discretion in rejecting the instruction on the ground it was untimely requested.

In addition, the asserted error in not giving the instruction was that "[t]he trial court erred in failing to take constitutionally mandated steps to prevent jurors from awarding an arbitrary amount in punitive damages based on potential harm to non-parties." The court instructed the jury, "You may not assess an amount of punitive damages against these defendants to punish them for injury they may have inflicted on others who are not a party to this lawsuit." Although Liberty Mutual contends that its proposed instruction was better than the one given by the district court, it makes no attempt to explain why the court's instruction did not adequately state the law. The court's instruction adequately informed the jury that in awarding punitive damages it could not seek to punish Liberty Mutual for harm it may have caused to nonparties.

**3. "The Supreme Court's recent punitive damage precedents forbid evidence of harm to persons in other jurisdictions."** Liberty Mutual quotes from *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 422 (2003), as follows, "A jury must be instructed . . . that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." It contends, "Plaintiffs' counsel's requests that the jury punish the insurance industry were not clearly limited to Idaho." Liberty

48

Mutual's citations to the record in support of that statement are parts of the direct examination of Dr. Norma Nielson, who has an undergraduate degree in mathematics and business and a masters and a doctorate in insurance and actuarial science. The only transcript page cited by Liberty Mutual upon which it made an objection that was overruled was its objection to the question, "Doctor, do you have an opinion as to whether or not states are particularly effective in regulating claims practices?" She answered that a book published in the eighties concluded that "a state department that's adequately resourced does an adequate job. If the department is under-resourced, it's very difficult to do a good job." It is difficult to see how this answer could be reasonably construed as evidence of harm to persons in other jurisdictions. Assuming that it could somehow be so construed, the district court instructed the jury that it may not "assess punitive damages with the intent and purpose of changing defendants' or others' conduct in other states or outside the State of Idaho" and that it may not "assess an amount of punitive damages against these defendants to punish them for injury they may have inflicted on others who are not a party to this lawsuit." As stated above, we assume the jury followed those instructions.

Liberty Mutual also states, "For these reasons, the District Court also erred by allowing Ms. Nielson to testify and not giving Defendants' requested Supplemental Jury Instruction No. 13 (instructing the jury to disregard her testimony)." It does not offer any argument or authority supporting this statement. "We will not consider assignments of error not supported by argument and authority in the opening brief." *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006).

**4. "*Campbell* forbids consideration of the Defendants' net worth."** Liberty Mutual contends that the district court erred by permitting the Weinsteins to present evidence of Liberty Mutual's net worth and by instructing the jury that it could consider such evidence if it decided to award punitive damages. Liberty Mutual argues, "This violated Defendants' Due Process rights by encouraging the jury to base its punitive damage award not on the Defendants' actual conduct in this case, but rather on their net worth." It asserts that this principle of law comes from the decision of the United States Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). What the Court actually held was:

> The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. . . . ("[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy . . . . *That does not make its use unlawful or inappropriate*; it simply means that this factor cannot make up for the failure of

49

other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct").

*Id*. at 427-28 (emphasis added). The district court did not err in permitting evidence of Liberty Mutual's net worth to be considered by the jury in arriving at an award of punitive damages.

**K. Did the Remitted Award of Punitive Damages in the Sum of $1,890,000 Violate Due Process?**

The jury awarded the Weinsteins punitive damages in the sum of $6,000,000. In response to Liberty Mutual's motion for a remittitur or, in the alternative, a new trial, the district court ordered a remittitur of the punitive damage award to $1,890,000 and granted Liberty Mutual a new trial as to punitive damages if the Weinsteins failed to accept that remittitur. Liberty Mutual contends that the remitted punitive damage award violates the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

We conduct a de novo review of the constitutionality of the amount of a punitive damages award. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431 (2001); *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 432 (1994). However, as to the remainder of the jury's verdict, we are bound by it, if it is supported by substantial and competent evidence, and we must construe it in a light most favorable to the party who prevailed in it. *Ross v. Coleman Co., Inc.*, 114 Idaho 817, 821, 761 P.2d 1169, 1173 (1988).

When reviewing punitive damage awards, we consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

**Degree of reprehensibility.** "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). The Supreme Court has instructed courts to determine the reprehensibility of a defendant by considering whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved

50

> repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419.  In this case, the initial harm caused was economic.  Liberty Mutual simply failed to pay insurance benefits that it owed.  However, its repeated refusal to pay those benefits caused severe emotional distress to Mrs. Weinstein.  The jury found that Liberty Mutual's conduct in delaying the payment of the bills was intentional and not the result of an honest mistake.  Its representative testified that it knew from the day after the accident that it owed for Sarah's injuries under the UM coverage.  The jury could also have concluded that it was seeking to take advantage of the Weinsteins' financial vulnerability.  The jury found that when causing Mrs. Weinstein's emotional distress, Liberty Mutual was aware of the nature, content, and probable consequences of its actions and acted with conscious disregard of such consequences.

Mrs. Weinstein repeatedly told the adjuster of the Weinsteins' financial difficulty, of the numerous telephone calls and demand letters from medical billing departments and collection agencies seeking payment of the overdue medical bills, but Liberty Mutual refused to pay sums it admittedly owed.  It took the position that it would not pay Sarah's undisputed medical bills until the Weinteins were willing to settle Sarah's entire claim, including her noneconomic damages.  One of its representatives testified that Liberty Mutual would not pay undisputed medical bills under UM coverage even if it was years before the entire UM claim was ready for evaluation.  The jury could reasonably have concluded that the refusal to pay the medical bills under these circumstances was intended to induce the Weinsteins to settle Sarah's entire claim for less than she was entitled.

Liberty Mutual repeatedly refused requests to pay Sarah's unpaid medical bills from the $245,000 of available UM coverage[6] until almost two years after the accident, and then it did so apparently only because its attorney told it to make the payments.  "This Court has recognized a 'special relationship between insurer and insured which requires that the parties deal with each other fairly, honestly, and in good faith' and acknowledges the disparity in bargaining power between the insurer and insured." *Featherston ex rel. Featherston  v. Allstate Ins. Co.*, 125 Idaho 840, 843, 875 P.2d 937, 940 (1994) (quoting *White v. Unigard*, 112 Idaho 94, 99, 730 P.2d 1014,

1019 (1986)). Policyholders purchase insurance to help protect themselves from some of the financial consequences caused by mishaps such as occurred here. They place trust and confidence in their insurer. Although Sarah's injuries were not life threatening, Mrs. Weinstein was obviously very concerned about the long-term consequences of the injuries. Her concern for her daughter undoubtedly increased her vulnerability to the financial pressures caused by Liberty Mutual's refusal to pay all of the undisputed medical bills. The refusal to pay the benefits was not a mere accident, nor was it an isolated incident resulting from the conduct of a low-level employee. It was the company's policy.

Liberty Mutual contends that there was "ample evidence that the Defendants acted reasonably and in good faith, despite the mistakes they admittedly made." Liberty Mutual certainly presented evidence seeking to convince the jury of that. However, the evidence was not persuasive.

**Ratio.** "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 580 (1996). "[E]xemplary damages must bear a 'reasonable relationship' to compensatory damages." *Id.* "[T]he proper inquiry is ' "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." ' " *Id.* at 581 (quoting *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460 (1993)) (emphasis in original). The harm issue is the harm to the Weinsteins, not to others. *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007).

The Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424 (2003). However, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution . . . ." *Id.* Ratios greater than that may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."

---

[6] Under the insurance policy, the limit of liability under the UM coverage was reduced by any sums paid under the MedPay coverage.

In this case, the district court believed that a $6 million award of punitive damages was appropriate under the facts of this case, but it granted a remittitur to $1.89 million, a single-digit award, to comply with decisions of the United States Supreme Court. Liberty Mutual contends the "court erred in reducing the punitive damages to only nine times the compensatory damages. The conduct at issue here, combined with the large emotional distress damage award to Mr. and Mrs. Weinstein, does not justify an award higher than the 1: 1 ratio . . . ."

Liberty Mutual argues, "The conduct at issue here, combined with the large emotional distress damage award to Mr. and Mrs. Weinstein, does not justify an award higher than the 1: 1 ratio reflected in the *Exxon Shipping* case and other recent cases." The ratio adopted in that case was based upon the exercise of federal maritime common law authority, not upon the Due Process Clause of the Constitution. As the Court stated, "Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process." *Exxon Shipping Co. v. Baker*, ___ U.S. ___, 128 S. Ct. 2605, 2626 (2008).

**Sanctions for comparable misconduct.** The third indicium is "the difference between [the punitive damages awarded] and the civil penalties authorized or imposed in comparable cases." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). Liberty Mutual asserts that the applicable civil penalty is the maximum fine of $10,000 under Idaho Code § 41-1329A for a violation of the Unfair Claim Settlement Practices Act. That Act proscribes Liberty Mutual's conduct in this case, but it also authorizes the additional sanction of suspension or revocation of Liberty Mutual's certificate of authority.

**Application.** In addition to the above guideposts, we can also consider the wealth of Liberty Mutual. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427-28 (2003); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991). However, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, 538 U.S. at 427. "There can be no dispute that Idaho has a legitimate interest in preventing the exploitation of its citizens by punishing insurance companies that exploit the vulnerability of their insureds." *Hall v. Farmers Alliance Mut. Ins. Co.*, 145 Idaho 313, 322, 179 P.3d 276, 285 (2008). "[I]f an insurance company could delay payment of a claim without repercussions extending beyond the amount it owed in the first place, an *incentive* to delay would exist." *Id*. at 322-23, 179 P.3d 285-86 (emphasis in original). There was additional harm to the Weinsteins

that was likely to occur and for which they were not awarded compensatory damages. There was evidence that some of the unpaid medical bills incurred as a result of Sarah's injuries were turned over to collection agencies. Eleven months after the accident, Mrs. Weinstein telephoned the adjuster, pleading to have Liberty Mutual pay the medical bills from the UM coverage. During that conversation, she told the adjuster that collection agencies were after them and their credit was ruined. Although the Weinsteins did not offer any other evidence of the impact upon their credit from having the bills turned over to collection agencies, it is certainly likely that it harmed their credit. Although one medical provider did threaten to terminate medical care until its bill was paid, it did not do so. The risk, however, illustrates the importance of deterring Liberty Mutual's conduct in this case. The district court's remittitur is certainly near the limit of what would comply with the decisions of the United States Supreme Court, but we do not find that it violates the Due Process Clause.

**L.    Did the District Court Err in Granting a New Trial on Punitive Damages if the Weinsteins Do Not Accept the Sum of $1,890,000 in Punitive Damages?**

The Weinsteins cross-appealed, contending that the district court erred in granting a new trial on punitive damages unless the Weinsteins accepted the remittitur of the punitive damages award from $6 million to $1.89 million. For the reasons stated above in our analysis of the remitted amount, we hold that the district court did not err. In addition, as we held in *Hall v. Farmers Alliance Mutual Insurance Co.*, 145 Idaho 313, 323-24, 179 P.3d 276, 286-87 (2008), "Because a new trial on the sole issue of punitive damages would be pointless, this Court vacates the district court's decision to allow the [Weinsteins] this 'option.'"

## IV.  CONCLUSION

We affirm the judgment for compensatory damages in favor of the Weinsteins and remand this case for entry of an amended judgment reducing the award of punitive damages to $1.89 million. We affirm the judgment for compensatory damages in favor of Sarah and her award of court costs, and we vacate her award of attorney fees and remand this case for redetermination of that award in a manner consistent with this opinion. Because all parties have

prevailed in part, we do not award costs on appeal.

Justices BURDICK, J. JONES, and HORTON **CONCUR**.

W. JONES, Justice, dissenting:

I respectfully dissent for the following reasons:

## I.      **Liberty Mutual Did Not Breach the UM Provisions of the Insurance Contract**

Linda Weinstein and her daughter, Sarah, were involved in a car accident caused by an uninsured motorist. They submitted medical bills for Sarah's injuries to Liberty Mutual pursuant to the uninsured motorist ("UM") provision of their automobile-insurance policy, which provided: "Our payment is based on the amount that an insured is *legally entitled to recover* for bodily injury but could not collect from the owner or operator of the uninsured  motor vehicle because [the owner or operator is not insured]." (Original emphases omitted; new emphasis added). Liberty Mutual admitted that the uninsured motorist was at fault, but refused to pay the bills piecemeal under the UM coverage, stating that it would only entertain offers to settle the entire UM claim at one time. Liberty Mutual indicated that it would wait until the medical prognosis for Sarah's injuries was sufficiently clear before offering to settle the claim for her future expenses.

When the Weinsteins sued Liberty Mutual under their UM policy, Liberty Mutual paid all the undisputed bills plus interest. It consistently maintained before and throughout trial, however, that it had no contractual duty to pay individual bills piecemeal as they arrived. This position is correct, and for that reason Liberty Mutual should have been granted a directed verdict or a judgment notwithstanding the verdict.

### 1.      *Liberty Mutual Properly Preserved the Multiple-Payments Issue for Appeal*

It is the appellant's duty "to not only clearly state its contentions to the trial judge, but to make such contentions, and the rulings thereon, of record so they may be reviewed on appeal." *Van Velson Corp. v. Westwood Mall Assocs.*, 126 Idaho 401, 406, 884 P.2d 414, 419 (1994). "[E]ither the specific ground for the objection must be clearly stated, or the basis of the objection

must be apparent from the context." *Slack v. Kelleher*, 140 Idaho 916, 921, 104 P.3d 958, 963 (2004).

Liberty Mutual repeatedly raised the issue that the jury should not be permitted to find a breach of contract when an insurer refuses to pay piecemeal medical bills under UM coverage. First, in its motion for a directed verdict, Liberty Mutual argued for six pages that UM carriers have no duty "to process a UM claim in a piecemeal basis, like a type of medical payments coverage." Second, in its written objection to the Weinsteins' proposed jury instructions, Liberty Mutual similarly contended that the instructions incorrectly suggested that "multiple claims are possible under UM where the Policy only provides for a single claim and single payment." Third, Liberty Mutual again argued for several pages in its motion for judgment notwithstanding the verdict that "there is no contract provision or independent duty to make multiple piecemeal payments."

Most importantly, Liberty Mutual expressly objected to Instruction 25 on the record. Instruction 25 encapsulated the multiple-payment issue, stating, "A fairly debatable dispute as to a portion of a claim does not relieve an insurance company from paying the undisputed portion of a claim within a reasonable period of time after it has assessed the monetary value of the undisputed portion of the claim." During the jury-instruction conference, Liberty Mutual provoked an extensive debate by objecting to Instruction 25, arguing that it had no duty to pay undisputed amounts until the entire UM claim could be evaluated. Liberty Mutual even interrupted the trial judge to ensure that the record contained its proposed instruction, which would have read, "A fairly debatable dispute as to the claim does not relieve an insurance company from paying the undisputed portion of the claim within a reasonable time after it has assessed the claim." The judge rejected the proffered instruction on the record. The multiple-payment issue was therefore amply preserved for appeal.

The majority opinion nonetheless contends that Liberty Mutual waived the issue by stipulating to Instruction 13, which told the jury the following:

6.      In insurance cases money becomes due as provided under the express terms of the insurance contract.

7.      If an insurance policy may be given either of two reasonable meanings, one which permits recovery and one which does not, the meaning more favorable to the insured should be adopted.

56

. . . .

9.      When a contract expresses no specific time for its performance, the law implies that it is to be performed within a reasonable time, as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance.

Even though Liberty Mutual argued in its brief that it had no duty to deliver piecemeal medical payments, the majority maintains that Liberty Mutual waived the issue altogether by stipulating to these separate instructions.

These jury instructions accurately state established law and are consistent with Liberty Mutual's theory about the case. Neither party has ever disputed the general principles that the express terms of the contract govern the timing of insurance benefits, that an ambiguous policy should be construed against the insurer, or that a contract must be performed within a reasonable amount of time if no time is set in the contract.

Liberty Mutual's theory, however, was that a UM policy by its very nature is unambiguous that no duty to pay UM benefits arises until the insurer can settle the entire claim. As Liberty Mutual asserted during the jury-instruction conference, a UM policy does not require performance until the insurer has "had the opportunity to evaluate the claim," including both the disputed and undisputed components. After the entire claim is evaluated, then the insurer must perform within a reasonable time if no time is provided in the contract. Since, as explained below, it is widely accepted that an insurer may settle a UM claim all at once, a settlement must be made within a reasonable time only after the whole claim can be evaluated. It was therefore perfectly consistent for Liberty Mutual to stipulate to Instruction 13.

Liberty Mutual also consented to another instruction, which required the jury to find "'that payments [plural] were not timely made,'" before there could be a breach of the UM policy. Even if a single letter could derail the most important thrust of Liberty Mutual's appeal, Liberty Mutual could have consented to such an instruction without waiving the multiple-payments issue. Again, Liberty Mutual asserted at trial that it had no duty to pay on a UM claim until the entire claim could be evaluated. After the claim is evaluated, it is irrelevant whether the insurer makes one or multiple payments. The dispute was instead encapsulated in Instruction 25, which explicitly directed the jury to assume that multiple payments could become due on a UM claim before it could be evaluated in its entirety.

2. *Liberty Mutual Did Not Breach the Insurance Contract by Requiring the Weinsteins to Settle Their Entire UM Claim*

This Court has never explained an insurer's contractual duties toward an insured seeking piecemeal payment of medical bills under a UM insurance policy. It has only upheld a breach-of-contract claim where the insurer refused to timely respond to the UM claimant's settlement offer. *Brinkman v. Aid Ins. Co.*, 115 Idaho 346, 350, 766 P.2d 1227, 1231 (1988); *see also Parsons v. Mut. of Enumclaw Ins. Co.*, 143 Idaho 743, 745–48, 152 P.3d 614, 616–19 (2007) (upholding an award of attorney fees for insurance company's tardy settlement offer).[7]

The Court's opinion views the UM provision here as ambiguous, but the provision was not ambiguous just because Idaho law has not clarified a UM provider's duties to its insureds. Of course, the trier of fact is to interpret ambiguous contract language against the insurer, *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 141 Idaho 660, 663, 115 P.3d 751, 754 (2005), and the terms "payment" and "legally entitled to recover" are not defined in the policy. However, "not every word and phrase in an insurance contract needs to be defined in the contract." *National Union Fire Ins. Co. v. Dixon*, 141 Idaho 537, 540, 112 P.3d 825, 828 (2005). "[T]he mere fact that a term is undefined in a policy does not make the term ambiguous if it has a settled legal meaning." *Melichar v. State Farm Fire & Cas. Co.*, 143 Idaho 716, 721, 152 P.3d 587, 592 (2007). "[W]here a word or phrase used in an insurance contract has a settled legal meaning or interpretation, that meaning or interpretation will be given effect although other interpretations are possible." *Nielsen v. Provident Life & Accid. Ins. Co.*, 100 Idaho 223, 226, 596 P.2d 95, 98 (1979) (citing *Stein-McMurray Ins. Inc. v. Highlands Ins. Co.*, 95 Idaho 818, 820, 520 P.2d 865, 867 (1974)). This can include looking to the decisions of other states interpreting the same contract language. *See Dixon*, 141 Idaho at 540, 112 P.3d at 828 (citing a Pennsylvania case).

The district court erred by permitting the jury to determine when medical payments were due on the Weinstein's UM "claim" because, under the unambiguous terms of the policy, they

---

[7] The Court in *Brinkman* determined that the cause of action on an underinsured-motorist policy accrues for the purposes of accumulating prejudgment interest at the moment of the accident or when a proof of loss is submitted if one is needed. 115 Idaho at 353, 766 P.2d at 1234. This point of law would have supported the Weinsteins' position if it were not later overruled; the rule now is that the cause of action accrues when payments are due under the terms of the policy. *Greenough v. Farm Bureau Mut. Ins. Co.*, 142 Idaho 589, 593, 130 P.3d 1127, 1131 (2006).

never made a claim in the first place. No policy provision specifically governed the timing and frequency of UM disbursements, so the parties expended considerable time debating whether the policy terms in this case provided only for a single "payment." But whether the contract uses the word "payment" or its plural is irrelevant because the language in this policy has a well-settled legal meaning. Like virtually all UM policies nationwide, the contract in this case states that Liberty Mutual's "payment" is based on "the amount that an insured is *legally entitled to recover* for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle." (Emphasis added). As explained below, Liberty Mutual used nationally uniform contract language in its UM policy. The law throughout the country is that the term "*legally entitled to recover*" does not obligate the insurer to pay under a UM policy until the claimant can establish the tortfeasor's liability and the extent of damages. 46A C.J.S. *Insurance* § 2331. The district court should not have viewed the policy as ambiguous as to whether multiple payments were due. Further, because Liberty Mutual had the right to wait until all of Sarah's damages were reasonably clear or until the insured made a claim for a single amount they would accept as the full *extent of damages* before offering payment, there was no breach of contract.

There was no factual issue for the jury to settle. This is because "[m]ost courts reason . . . that the language 'legally entitled to recover' is clear and unambiguous." *Matarese v. New Hampshire Mun. Ass'n Property Liability Ins. Trust*, 791 A.2d 175, 181 (N.H. 2002); *accord Perkins v. Insurance Co. of N. Am.*, 799 F.2d 955, 962 (5th Cir. 1986) (applying Mississippi law); *State Farm Mut. Auto. Ins. Co. v. Royston*, 817 P.2d 118, 121 (Haw. 1991). When interpreting what a UM claimant is "legally entitled to recover," the universal rule is that "[t]he insured must be able to establish fault on the part of the uninsured motorist which gives rise to the damages and to prove the *extent of those damages*." *Patrons Mut. Ins. Ass'n v. Norwood*, 647 P.2d 1335, 1338 (Kan. 1982) (quotation omitted; emphasis added).[8] Because the claimant

---

[8] *Accord Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 378 (9th Cir. 1997) (applying California law); *Harvey v. Mitchell*, 522 So. 2d 771, 773 (Ala. 1988); *Borjas v. State Farm Mut. Auto. Ins. Co.*, 33 P.3d 1265, 1269 (Colo. Ct. App. 2001); *Cincinnati Ins. Co. v. Trosky*, 918 N.E.2d 1, 9 (Ind. Ct. App. 2009); *Winner v. Ratzlaff*, 505 P.2d 606, 610 (Kan. 1973); *U.S. Fid. & Guar. Co. v. Preston*, 26 S.W.3d 145, 148 (Ky. 2000); *Booth v. Fireman's Fund Ins. Co.*, 253 La. 521, 529, 218 So. 2d 580, --- (La. 1969); *W. Am. Ins. Co. v. Popa*, 723 A.2d 1, 7 (Md. 1998); *Oates v. Safeco Ins. Co.*, 583 S.W.2d 713, 715 (Mo. 1979); *Swift v. Dairyland Ins. Co.*, 547 N.W.2d 147, 151 (Neb. 1996); *Boradiansky v. State Farm Mut. Auto. Ins. Co.*, 156 P.3d 25, 30 (N.M. 2007); *Karlson v. City of Oklahoma City*, 711 P.2d 72, 74–75 (Okla. 1985); *Vega v.*

must be able to show the extent of his or her damages, "a bad faith claim either does not exist or should be held in abeyance until there is a final resolution of the contractual coverage claim." *Martin v. State Farm Mut. Auto. Ins. Co.*, 960 F. Supp. 233, 236 (D. Nev. 1997); *accord* 46A C.J.S. *Insurance* § 2331 (2009); *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1276 (Fla. 2000) (stating that a bad-faith action "is premature until there is a determination of liability and extent of damages owed"). Successful bad-faith claims therefore invariably involve the insurance company's failure to *settle* in good faith, not a failure to pay individual medical bills. *E.g. Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 381 (Nev. 1993); *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 828 (Wyo. 1994). There is no UM "claim" until the claimant is ready to show the *extent of damages* caused by the tortfeasor, which is not established by submitting individual medical bills as they come in. Submitting individual bills shows nothing more than part of the damages. Since the Weinsteins refused to settle for a single amount constituting the extent of damages they were legally entitled to recover from the tortfeasor, they simply never made a claim.

Because a UM carrier's liability is tied to the third-party tortfeasor's liability, UM claims present a more complex situation for insurers. For example, the Superior Court of Pennsylvania characterizes UM claims as "hybrid claims that involve elements of both first party claims and third party claims." *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. 2006); *accord Ex Parte Safeway Ins. Co.*, 990 So. 2d 344, 351 (Ala. 2008). Of course, UM claims are similar to first-party claims in that the insured is claiming directly against the insurer and is entitled to notice of the rights and benefits under the policy. *Id.* at 1144. There are, however, real differences between the two types of coverage:

---

*Farmers Ins. Co.*, 895 P.2d 337, 342 (Or. Ct. App. 1995); *Brainard v. Trinity Univ. Ins. Co.*, 216 S.W.3d 809, 815 (Tex. 2007).

Put another way, this language means that the claimant has to be able to prove "that the other driver cannot pay some or all of what the insured driver would be entitled to receive under tort." Mark J. Browne, Ellen S. Pryor & Bob Puelz, *The Effect of Bad-Faith Laws on First-Party Insurance Claims Decisions*, 33 J. Legal Stud. 355, 365 (2004).

U-claims[9] are like third party claims because the contract of insurance sets them up that way. The traditional insuring agreement contained in the Uninsured and/or Underinsured Motorist section of the policy provides that the insurer agrees to pay to the insured the amount that the insured would otherwise be legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle.

. . . .

U-claims are like third party claims because the insured is naturally and inherently seeking to maximize his recovery of general damages, while the insurer seeks, within reasonable limits, to minimize that recovery. U-claims bear another similarity to third party claims insofar as each side is entitled, but not required, to have legal counsel, charged with the role and responsibility of advocating the interest of his or her client.

U-claims are also like third party claims in the practical sense of the presentation of issues and positions which can arise in the claim.

*Condio*, 899 A.2d at 1143 (citation omitted); *see also Craft v. Econ. Fire & Cas. Co.*, 572 F.2d 565, 569 (7th Cir. 1978) ("In the uninsured motorist situation there is no element of 'control' of the insured's side of the litigation by the insurance company which would give rise to a 'fiduciary' duty."). The duty of good faith does not "require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit." *Condio*, 899 A.2d at 1145.

Thus, because insurance companies have different incentives and obligations when dealing with UM claims, they must be permitted to treat UM claimants differently from classic first-party claimants. UM coverage "is neither an all-risk insurance designed to provide coverage for all injuries incurred, nor is it a no-fault motor vehicle insurance that provides coverage without regard to whether a plaintiff is legally entitled to recover damages from an uninsured or unidentified motorist." *Masler v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 633,

---

[9] Sometimes courts lump together discussions of UM policies with discussions of underinsured-motorist policies, calling them both "u-claims" because the two types of coverage share many similarities.

61

635 (Ky. 1995). "[B]y attempting to regulate the adversarial relationship created by the uninsured motorist coverage, the result may be to diminish that adversarial relationship to the point of turning the coverage into something more like a first-party coverage than what it was designed and conceived to be." William A. Mayhew, *Bad Faith and the Uninsured Motorist Claim*, 19 Forum 618, 636 (1984). Requiring insurers to pay medical bills on demand as the Court's opinion holds would essentially turn UM policies into a form of medical insurance for claimants injured by inadequately insured drivers. That has never been the purpose of a UM policy.

I have found no authority anywhere suggesting that UM claimants and ordinary first-party claimants have the same relationship to the insurance company. Instead, the goal is "to afford the same protection to a person injured by an uninsured motorist as would have been enjoyed had the tortfeasor carried liability insurance." *Ryals v. State Farm Mut. Auto. Ins. Co.*, 134 Idaho 302, 307, 1 P.3d 803, 808 (2000). The law in Idaho is consistent with the nearly universal principle that the purpose of UM coverage is met "by placing the insured in the same position as if the uninsured motorist had been insured, not a better position." *Matarese*, 791 A.2d at 181; *accord Vogelin v. Am. Family Mut. Ins. Co.*, 213 P.3d 1216, 1222 (Or. 2009); *Theis v. Midwest Sec. Ins. Co.*, 606 N.W.2d 162, 167 (Wis. 2000). Even in a suit against an uninsured tortfeasor where the insurer has interpleaded to defend as the real party in interest, "it is the accident and the driver who caused it, rather than the insurer from which plaintiff now seeks a recovery . . . that is in any way relevant to the issues to be decided." *Bardis v. First Trenton Ins. Co.*, 971 A.2d 1062, 1068 (N.J. 2009). Since the insurer is only liable for what the tortfeasor would have to pay, it can contest damages and assert defenses such as comparative fault, provided it does so in good faith. *See Walden v. Nationwide Ins. Co.*, 131 Idaho 18, 20, 951 P.2d 949, 951 (1998) (affirming summary judgment against the insured and holding that an insurance carrier could demand arbitration on a fairly debatable UM claim); *see also Ellwein v. Hartford Accident & Indem. Co.*, 15 P.3d 640, 645–46 (Wash. 2001) (citing cases from around the country stating that the UM insurer can assert good-faith defenses against the insured).

If UM claimants are to be in the same position they would be in if they were claiming directly against the tortfeasor, then the insurer is not obligated to pay medical bills as they arrive any more than the tortfeasor would be. The amount of damages that a tortfeasor would have to pay would only be determined by settlement, arbitration, or litigation. In all of these methods of

claim resolution, a single agreement or judgment would be entered fixing damages. The settlement or judgment would not provide just for past undisputed medical bills, but also for less quantifiable damages such as pain and suffering or emotional distress, as well as for less certain damages such as future medical costs and lost wages. Some damages cannot be valued until all damages are known, such as pain and suffering, permanent injuries or disabilities, or lost limbs.

Holding that UM claimants should be treated the same as all first-party insureds would also pencil new terms into every UM policy in the state. Again, there were no terms in the Weinsteins' policy permitting them to collect multiple medical payments. Even though requiring piecemeal payment would certainly benefit the Weinsteins, this Court does not have the power to rewrite insurance contracts, even if the terms seem harsh. *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 41–42, 72 P.3d 877, 881–82 (2003). The UM provision stating that the Weinsteins could only receive what they would be "legally entitled to recover" has an established legal meaning and was therefore unambiguous.

Because the jury was improperly instructed that the Weinsteins were entitled to multiple payments under the terms of their insurance policy, and because the Weinsteins provided no evidence that Liberty Mutual failed to timely settle their claim, Liberty Mutual should have been granted a directed verdict or a judgment nothwithstanding the verdict in its favor.

## II.     Liberty Mutual Did Not Act in Bad Faith In Handling the Weinsteins' UM Claim

Liberty Mutual, relying on the advice of counsel, informed the Weinsteins that it would settle their entire UM claim rather than pay medical bills piecemeal. The Weinsteins refused to settle or to offer to settle the claim, and instead chose to sue for bad faith.[10]

Liberty Mutual's behavior with regard to this claim was not bad faith as a matter of law for two intertwined reasons: (1) it was fairly legally debatable whether an insurer could require a UM claimant to settle a claim given the unclear law in Idaho, and (2) since Liberty Mutual relied

---

[10] At trial, Liberty Mutual argued to the jury that the law was unsettled in Idaho as to whether a UM carrier was required to pay pre-settlement medical bills, in effect asking the jury to interpret the condition of state law. It requested the court to instruct the jury that "[w]hen a claim involves a legal question of first impression, an insurer does not commit bad faith by litigating the claim even if the insurer does not prevail." The court erroneously declined to give this instruction. The Weinsteins contended at trial that other district courts in Idaho had issued rulings requiring UM carriers to pay medical bills before settlement. In response, Liberty Mutual requested a jury instruction stating that district-court rulings were not binding law across the state. This instruction was also erroneously denied.

on the advice of its lawyers regarding an issue long-settled in other jurisdictions, as pointed out in Part I above, Liberty Mutual did not delay settling the Weinsteins' claim intentionally or negligently. Indeed, no "claim" was ever actually submitted under UM coverage. It was not a factual issue for the jury to decide whether the law was unsettled, but rather a legal issue for the court. By determining that a UM carrier could commit bad faith by refusing to make pre-settlement medical payments, the district court committed legal error.

1. *It Was Fairly Legally Debatable Whether Liberty Mutual Had to Pay the Weinsteins' Medical Bills Piecemeal*

Regardless of whether Liberty Mutual breached the terms of the contract, the tort of insurance bad faith requires proof beyond mere breach. To prevail on a claim of bad faith, "the insured has the burden of showing that the claim was not fairly debatable." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). "[W]hen a claim [of bad faith] involves a legal question of first impression, an insurer does not commit bad faith by litigating the claim even if the insurer does not prevail." *Vaught v. Dairyland Ins. Co.*, 131 Idaho 357, 362, 956 P.2d 674, 679 (1998). Liberty Mutual could have concluded in good faith that Idaho law would permit an insurer to settle a UM claim all at once.

Idaho law is far from clear that the UM carrier's duty of good faith is coextensive with that of any other first-party carrier's duties to its insureds. In *White v. Unigard Mutual Insurance Co.*, this Court created a private cause of action for insurance bad faith against first-party insurance carriers. 112 Idaho 94, 98, 730 P.2d 1014, 1018 (1986). This Court expressly held in *Unigard* that the duty of good faith persists even if the insured files a lawsuit initiating an adverse relationship with the insurer. *Id.* at 100; 730 P.2d at 1020. Nonetheless, this Court later acknowledged that conflicts of interest between insurers and claimants "will inherently exist in uninsured motorist claims." *Bantz v. Bongard*, 124 Idaho 780, 785, 864 P.2d 618, 623 (1993). The Court has further suggested that a different duty of care applies to UM claims, even hinting that a bad-faith action might not be brought against a UM carrier *at all*. In a 1998 case, the Court stated that it was "[a]ssuming, without deciding, that a bad faith action can arise from an uninsured motorist claim," before holding that the UM carrier had not engaged in bad faith because of its incorrect but good-faith interpretation of unsettled law. *Vaught*, 131 Idaho at 362, 956 P.2d at 679. Similarly, in another post-*Unigard* case the Court stated: "[W]e need not decide the legal relationship which exists between an insured and an insurance carrier when the

64

injured makes a claim under an uninsured motorist clause of an insurance policy, *i.e., whether that relationship is adversarial or fiduciary.*" *Sullivan v. Allstate Ins. Co.* ("*Sullivan II*"), 117 Idaho 880, 882, 792 P.2d 905, 907 (1990) (emphasis added) (quoting *Sullivan v. Allstate Ins. Co.* ("*Sullivan I*"), 111 Idaho 304, 306, 723 P.2d 848, 850 (1986)). It has never been clear whether a UM claim must be handled the same as any other first-party insurance claim.

Given the sparse treatment that the duty of good faith has received in UM case law, Liberty Mutual could reasonably have discerned from other jurisdictions' decisions that it could resolve the UM claim at one time. Since *Unigard*, this Court has only upheld summary *dismissal* of bad-faith actions arising from UM or underinsured-motorist claims. *E.g. Am. Foreign Ins. Co. v. Reichert*, 140 Idaho 394, 403, 94 P.3d 699, 708 (2004); *Anderson v. Farmers Ins. Co.*, 130 Idaho 755, 759, 947 P.2d 1003, 1007 (1997) *overruled on other grounds by Martin v. State Farm Mut. Auto. Ins. Co.*, 138 Idaho 244, 61 P.3d 601 (2002) (upholding summary dismissal because it was fairly debatable whether the claimant was partially responsible for damages). This Court, however, has apparently never upheld a bad-faith action against a UM or under-insured-motorist carrier, let alone an action such as this where the insured, not the insurer, refused to negotiate a settlement. As explained above, a tremendous amount of authority from other jurisdictions indicates that a UM claimant is not entitled to payment until the extent of damages is known. According to these sources, the Weinsteins' demand for payment was not just "fairly debatable," but was not even a "claim" at all since there was no showing of the *extent of damages*, but only individual medical bills. Liberty Mutual reasonably relied on counsel's advice in declining to pay individual medical bills to the Weinsteins.[11]

The Court's opinion states that the Weinsteins' claim was not fairly debatable because, under *Inland Group of Companies, Inc. v. Providence Washington Insurance Co.*, 133 Idaho 249, 985 P.2d 674 (1999), the insurer cannot refuse to pay undisputed components of an insurance claim. This case, however, only involved an insurance company's refusal to pay undisputed amounts in an offer to settle an ordinary claim under a first-party commercial-

---

[11] In some jurisdictions, the insurance company "owes no fiduciary duty to its insured in a claim arising under an uninsured motorist provision. . . . The respective interests of insurer and insured in such an action are adverse." *Lauzon v. State Farm Mut. Auto. Ins. Co.*, 674 A.2d 1246, 1248 (Vt. 1995). Thus, a significant minority of states do not permit any tort recovery for bad faith against a u-claim carrier. *E.g. Lawton v. Great Sw. Fire Ins. Co.*, 392 A.2d 576, 581 (N.H. 1978); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985).

insurance policy, not a UM policy. *Id.* at 251–52, 985 P.2d at 676–77. Liberty Mutual would have to engage in significant inductive reasoning to conclude that *Inland* required ongoing medical payments here. First, Liberty Mutual would have to infer that it must make ongoing payments not just after, but also before making a settlement offer. Second, it would also have to surmise that the ongoing-payment requirement applies not just to first-party insurers like the one in *Inland* but also to UM carriers with a unique relationship to their insureds. Again, Liberty Mutual would have to reach this conclusion in the face of direct authority from Idaho suggesting that ordinary rules do not apply to bad-faith claims under UM policies as well as contrary cases from across the country.

### 2. *Liberty Mutual Did Not Intentionally or Negligently Delay Settling in Bad Faith*

In *Unigard*, this Court held that a party claiming extra-contractual damages for insurance bad faith must either prove that the insurer has "intentionally and unreasonably" denied or delayed payment, provided the other elements are met. 112 Idaho at 100, 730 P.2d at 1020. Two years later, this Court extended liability for insurance bad-faith to negligent delays or denials of insurance coverage. *Reynolds v. Am. Hardware Mut. Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243, 1246 (1988).

Similar to an ordinary first-party insurer, Liberty Mutual owes a duty of good faith to the Weinsteins even though a UM claim presents a "hybrid" set of duties to the insured. *See Unigard*, 112 Idaho at 100, 730 P.2d at 1020 (stating that insurers in a first-party insurance contract are in a fiduciary relationship with their insureds); *Simper v. Farm Bureau Mut. Ins. Co.*, 132 Idaho 471, 474, 974 P.2d 1100, 1103 (1999) (same). UM insureds pay premiums to their insurers and should expect that many of the same features of good faith would apply. The insurer may not intentionally or unreasonably delay the final settlement process. *Cf. Inland*, 133 Idaho at 255, 985 P.2d at 680 (holding that an ordinary first-party insurer cannot delay claim settlement). It also "must go about the business of investigating and evaluating the claim," when it learns of a possible claim so as to enable a settlement offer as soon as the claimant's present and future expenses are sufficiently clear. *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1112 (Okla. 1992). Similarly, the insurer should entertain reasonable offers from the insured to settle, even if the insurer has not yet gathered information sufficient to make an offer of its own. *Cf. Inland*, 133 Idaho at 255, 985 P.2d at 680 ("The duty to act in good faith exists at all times during the settlement process.").

Nonetheless, prominent tort commentators warn that bad-faith actions can unfairly punish insurers where there is no culpable act by the insurer. Insurance companies, like people, often behave badly in ways that can seriously harm those with whom they do business. But punishment without evidence of culpability can undermine the purpose of bad-faith law. Bad-faith remedies are designed to protect consumers from intentional or reckless insurance practices. Victor E. Schwartz & Christopher E. Appel, *Common-Sense Construction of Unfair Claims Settlement Statutes: Restoring the Good Faith in Bad Faith*, 58 Am. U. L. Rev. 1477, 1497 (2009). Refusing to demand a meaningful level of culpability provides "a windfall recovery to claimants" for the insurer's honest mistakes by appealing to "the biases that juries maintain against insurers." *Id.* at 1529. It encourages quick settlements at higher prices, causing insurers to pass extra-contractual damages on to consumers as higher premiums. *Id.* at 1528. In turn, higher premiums price more people out of the insurance market, worsening the very problem that UM coverage is intended to combat: the unexpected losses caused by uninsured or underinsured drivers on the road.

There is no evidence that Liberty Mutual intentionally sought to starve out the Weinsteins by delaying a settlement in bad faith or otherwise acted in an objectively unreasonable manner. Instead, the only potentially culpable act that Liberty Mutual committed was relying on the advice of its lawyers. As explained above, however, even the general parameters of a UM insurer's duty of good faith has not been clarified by this Court, while the law elsewhere is largely settled that pre-settlement payments are unnecessary. The Weinsteins' attorney never provided legal authority to Liberty Mutual as it requested to explain why it could not require the Weinsteins to settle, and indeed he could not have done so. Liberty Mutual therefore simply relied in good faith on its attorney's interpretation of Idaho law and insisted on settling the claim in total rather than paying piecemeal benefits.

Liberty Mutual committed some bureaucratic bungling by delaying the Weinsteins' MedPay claims based on an incorrect interpretation of its coordination-of-benefits provision. This, in turn, temporarily barred the Weinsteins from recovering under their UM policy because such recovery was only available if the MedPay benefits were exhausted. Nonetheless, the jury found no bad faith in how Liberty Mutual handled the MedPay claim. Moreover, Liberty Mutual's policy of settling UM claims all at once, and the Weinsteins' refusal to comply with that policy, would have resulted in the same delay because it was unclear what further treatment

Sarah would require for her injuries. Liberty Mutual informed the Weinsteins that they could make a settlement offer, but the Weinsteins never did so. The Weinsteins apparently did not want to settle at least in part because it appeared that Sarah would need ongoing medical treatment.

Liberty Mutual did send a pre-settlement advance of $10,000 to the Weinsteins along with an agreement stating: (1) that the payment did not mean Liberty Mutual waived any of its rights or defenses to the claim; and (2) the agreement was not a concession of the tortfeasor's liability. Such an offer does not constitute bad faith. Again, Liberty Mutual, relying on the informed opinion of its attorney, believed in good faith that such an offer was not necessary in the first place, and was merely extending the offer to make peace. Neither of these terms is unreasonable either. First, as previously mentioned, the insurer may, so long as it acts in good faith, assert any defenses to payment that the tortfeasor could have asserted. *See Vaught*, 131 Idaho at 362, 956 P.2d at 679 (stating that an insurer does not commit bad faith in challenging a fairly debatable claim). Liberty was not attempting to reserve any rights it did not already have. Second, Liberty Mutual had already conceded the tortfeasor's liability. At worst, Liberty Mutual was simply refusing to concede the extent of the tortfeasor's liability by making the settlement-advance offer; it was not attempting to deny the tortfeasor's fault in colliding with the Weinsteins' vehicle. Whether or not Liberty Mutual regarded its settlement advance as admitting the tortfeasor's "liability" was therefore immaterial.

Liberty Mutual relied on the advice of its attorneys in waiting to settle the Weinsteins' entire UM claim. Given the ambiguous state of Idaho law at the time and the overwhelming authority from other jurisdictions that supported its actions, Liberty Mutual's decision to rely on this advice was reasonable. Accordingly, it did not act in bad faith as a matter of law and was entitled to a directed verdict or a judgment nothwithstanding the verdict.

## III.    The Punitive Damages as Remitted Are Unconstitutional

Preliminarily, the Court's Opinion applies an incorrect standard of review. The Opinion correctly states that this Court must uphold the jury's findings of fact, provided they are supported by substantial and competent evidence. *Idaho Power Co. v. Idaho State Tax Comm'n*, 141 Idaho 316, 321, 109 P.3d 170, 175 (2005). But because "the level of punitive damages is not really a 'fact' 'tried' by a jury," this Court freely reviews the punitive-damages award to ensure that it comports with due process. *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532

U.S. 424, 437, 121 S. Ct. 1678, 1686 (2001) (quotation omitted). The Court's opinion instead determines that the jury acted reasonably in determining a number of facts unfavorable to Liberty Mutual, but does not engage in an independent constitutional analysis to determine if the facts found by the jury could, as a matter of law, support such an unusually high punitive-damages award. For example, the Court's opinion states that the jury "could reasonably have found" that Liberty Mutual intended to starve the Weinsteins out and that Liberty Mutual recklessly caused the Weinsteins' emotional distress. This, however, is only half of the analysis. The Idaho Supreme Court exercises free review over constitutional issues. *Plummer v. City of Fruitland*, 139 Idaho 810, 812, 87 P.3d 297, 299 (2004). It is the task of this Court to determine if the award in this case comports with the Due Process Clause in light of the recent U.S. Supreme Court cases restricting punitive damages, not merely whether the jury could have found facts that reflect negatively on Liberty Mutual.

Regarding the substance of the award, "[i]t is well settled that punitive damages are not favored in the law and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits." *New Villager Condo. Ass'n v. Idaho Power Co.*, 129 Idaho 551, 554, 928 P.2d 901, 904 (1996) (quoting *Manning v. Twin Falls Clinic Hosp.*, 122 Idaho 47, 52, 830 P.2d 1185, 1190 (1992)). There is no mathematical formula for determining the constitutionality of a punitive-damages award, but the U.S. Supreme Court has identified three factors to guide the analysis: (1) the reprehensibility of the conduct; (2) the relationship between the penalty and the actual or potential harm; and (3) other sanctions imposed or available for similar conduct. *Myers v. Workmen's Auto. Ins. Co.*, 140 Idaho 495, 509, 95 P.3d 977, 991 (2004).

Even if Liberty Mutual's actions can be considered tortious bad faith, its erroneous reading of Idaho law is at worst an act of negligence. Thus, none of these factors favor upholding the award in this case even as remitted. The Weinsteins are not entitled to punitive damages, and even if they are, the award should be limited to a 4:1 ratio.

1.      *The Reprehensibility of Liberty Mutual's Conduct Does Not Justify Any Punitive Damages*

Because punitive damages are designed to punish and deter, the Due Process Clause requires that the defendant's conduct be sufficiently reprehensible. *State Farm Mut. Auto. Ins.*

*Co. v. Campbell*, 538 U.S. 408, 419, 123 S. Ct. 1513, 1521 (2003). To determine if the plaintiff has overcome this burden, the U.S. Supreme Court has directed the courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

First, it is true that the Weinsteins were financially vulnerable. They warned Liberty Mutual that they needed cash to pay past-due medical bills. There is also evidence that they suffered some mental anguish over their precarious financial situation. The Weinsteins experienced familial strife and Mrs. Weinstein in particular cried and was embarrassed at a doctor's office. The family suffered anxiety over whether Sarah would be able to receive the medical treatment she needed especially because Liberty Mutual indicated to their creditors that the Weinsteins' MedPay benefits had been exhausted, which, by the way, was a true statement.

Nonetheless, the Weinsteins suffered primarily economic damage, and there is no reason why this harm was not fully redressable by bad-faith compensatory damages. "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

More importantly, the Weinsteins do not attempt to explain why the bad-faith award does not redress their mental anguish. In *Campbell*, the claimants suffered similar mental distress at the hands of their insurer, but the Court determined that they had been made whole, noting that "compensatory damages . . . already contain this punitive effect." 538 U.S. at 426, 123 S. Ct. at 1525. The Weinsteins received $210,000 in compensation for their bad-faith claim. As the Weinsteins themselves vigorously argued in their briefs, the bad-faith damages are meant to compensate them for whatever mental hardship they endured. *Walston v. Monu. Life Ins. Co.*, 129 Idaho 211, 218, 923 P.2d 456, 463 (1996). There is no further reason to assess punitive damages.

Second, Liberty Mutual has not repeatedly engaged in unlawful practices. "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful" would indicate a higher degree of reprehensibility. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–77, 116 S. Ct. 1589, 1599 (1996). In *Gore*, for example, the jury awarded punitive damages for fraud because BMW did not inform the plaintiff that his new car had been repainted even though BMW's disclosure policy complied with the strictest applicable state regulations. *Id.* at 578, 116 S. Ct. at 1600. The U.S. Supreme Court found that BMW's disclosure policy showed no evidence of reprehensibility. *Id.* at 579, 116 S. Ct. at 1601. Similarly, there is no indication that Liberty Mutual "persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions." *Id.* The Weinsteins can provide no direct legal authority from anywhere requiring a UM carrier to pay medical bills piecemeal rather than simply settle the entire claim in good faith. Liberty Mutual's settlement policy is apparently in place because its attorneys believed that, under the law in Idaho and elsewhere, a bad-faith claim does not accrue until the claimant can prove the extent of damages. This undercuts a finding that Liberty Mutual acted reprehensibly.

Third, there is no allegation of intentional fraud, malice or other invidious activity. *Cf. Walston*, 129 Idaho at 221–22, 923 P.2d at 466–67 (upholding punitive damages against an insurance company for widespread deceptive marketing); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003) (noting that racial discrimination is particularly reprehensible). Nor was there any intentional infliction of harm. *See Highland Enter. v. Barker*, 133 Idaho 330, 348, 986 P.2d 996, 1014 (upholding modest punitive damages for defendants' intentional efforts to damage plaintiffs' construction equipment). Again, this is not an ordinary wrongful denial of benefits case where Liberty Mutual defied well-established rules of insurance law. Liberty Mutual's reliance on its attorneys' advice was at worst negligent, not malicious. Liberty Mutual's agents knew that Liberty Mutual's settlement policy might create anxiety for the Weinsteins and jeopardize their credit, but this was certainly not the goal of Liberty Mutual's actions. The notes and letters from Liberty Mutual's agents do not evince any intent to "starve" the Weinsteins out or to exploit their financial weakness. Liberty Mutual indicated to the Weinsteins that they could settle their claim early and obtain the compensation they needed. As the insurer, Liberty Mutual would have been obligated to negotiate such a settlement in good faith. *Inland Group of Cos. v. Providence Wa. Ins. Co.*, 133 Idaho 249, 255, 985 P.2d 674, 680

(1999). The conduct at issue here, even if damaging, was simply not so reprehensible as to justify any punitive damages at all, let alone such a peculiarly high ratio of damages.

> 2. *Even If Punitive Damages Were Allowed, the Ratio of Punitive Damages to Compensatory Damages Should Not Exceed 4:1*

The jury awarded $210,000 in compensatory damages for bad faith and $6 million in punitive damages, an award with a 28.5:1 ratio of punitive to compensatory damages. The district court remitted the award to $1.85 million, or a 9:1 ratio.

The U.S. Supreme Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524. The Court, however, has noted that punitive statutes dating back hundreds of years did not exceed a 4:1 ratio, and has further instructed that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* The median punitive-damages award in the United States is below even a 1:1 ratio. *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2624 & n.14 (2008) (citing Eisenberg et al., *Juries Judges, and Punitive Damages: Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001 Data*, 3 J. Empirical L. Stud. 263, 271 (2006)). The Due Process Clause demands consistency and predictability in this area. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty." *Gore*, 517 U.S. at 574, 116 S. Ct. at 1598. Since the majority of punitive-damages cases result in awards a small fraction of even the remitted award in this case, it follows that exceptional circumstances must justify the award if it is to exceed a 4:1 ratio. Exceptional circumstances are absent here.

"[H]eavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect . . . or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue)." *Exxon*, 128 S. Ct. at 2622. In *Hall v. Farmers Alliance Mutual Insurance Co.*, a homeowner's insurance company unjustifiably delayed paying a first-party claim for over two years and was found liable by a jury for bad faith. 145 Idaho 313, 317, 179 P.3d 276, 280 (2008). This Court upheld the district court's decision to remit the award down to a 4:1 ratio, reasoning that the insurance company's delay "does not involve a situation in which the injury was difficult to detect or the value of noneconomic harm was difficult to determine." *Id.* at 323, 179 P.3d at 286. It is difficult to articulate a reason why Liberty Mutual

should be treated differently from the defendant in *Hall*.  The compensatory damages in that case were about $19,000, roughly 10% of the $210,000 the Weinsteins received, indicating that the Weinsteins had plenty of incentive to sue.  *Id.* at 317, 179 P.3d at 280.  Liberty Mutual did not attempt to hide anything—it was, in fact, quite clear that it would only settle the Weinsteins' claim, not pay piecemeal.  A 4:1 ratio would therefore be the constitutional limit of the Weinsteins' recovery.

Compare the ratio in this case with others where defendants received lighter punishments for more culpable conduct.  In one Ninth Circuit case, a large employer paid a 6:5 ratio for consciously permitting a pervasive atmosphere of ethnic discrimination in the workplace and for wrongful discharge.  *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 910 (9th Cir. 1999).  In another case, the court reduced from 10:1 to 3:1 a punitive-damages award against a state regulator who abused his office to tortiously interfere with the plaintiff's business.  *S. Union Co. v. Irvin*, 563 F.3d 788, 792 (9th Cir. 2009).

The Court's opinion does not directly address the exceptionally high damages ratio remitted by the district court.  Instead, it dismisses Liberty Mutual's request for a 1:1 ratio and seems to suggest that Liberty Mutual has somehow waived the argument that the ratio should be reduced to some other value, such as 4:1.  Of course, an appellant waives an issue if it is not supported by authority or argument on appeal, *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 16, 175 P.3d 172, 178 (2007), but Liberty Mutual dedicated several pages of its opening brief to the specific issue of an appropriate punitive-damages ratio.  It put the Weinsteins on notice of a constitutional challenge to the remitted award by arguing that the reprehensibility of Liberty Mutual's conduct and the availability of other sanctions did not support such a high ratio.  Liberty Mutual should not be penalized for not "choosing a correct ratio among the infinite number of ratios theoretically available" in its brief.  *Southern Union*, 563 F.3d at 791.  Requiring the appellant to name a ratio, or a specific damages amount for that matter, would take to a logical extreme the requirement that issues must be properly preserved on appeal.

3.     *Other Sanctions*

"[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."  *Gore*, 517 U.S. at 583, 116 S. Ct. at 1603 (quoting *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 310, 109 S. Ct. 2909, 2934 (1989)

(O'Connor, J., concurring in part)). In *Gore*, the Court noted that the maximum fine in *any state* for the defendant's misconduct was $10,000, an amount too small to put the defendant on notice that it might suffer a $2 million punitive-damages award. *Id.* at 584, 116 S. Ct. at 1603. Similarly, the maximum fine under the Idaho Unfair Claim Settlement Practices Act is $10,000. I.C. § 41-1329A. Just as was the case in *Gore*, such a small penalty could not have put Liberty Mutual on notice of a possible $1.85 million judgment.

Because Liberty Mutual's conduct was not sufficiently reprehensible, no punitive damages should have been awarded. Even if punitive damages were appropriate, a 4:1 ratio should have been the maximum, given that no aggravating circumstances were at play here to justify a ratio outside of the mainstream of punitive-damages cases.

## CONCLUSION

I would reverse the judgment in favor of the Weinsteins. The district court erroneously instructed the jury that it could find a breach of contract and insurance bad faith simply because Liberty Mutual refused to pay portions of an otherwise fairly debatable UM claim. These instructions incorrectly applied fairly debatable law in the State of Idaho. Similarly, the punitive-damages award in this case violates the Due Process Clause because it punishes Liberty Mutual for its reasonable interpretation of ambiguous state law. I would therefore also reverse the punitive damages award against Liberty Mutual or, in the alternative, remit the award to a 4:1 ratio.

74